PRESENT: Koontz, Kinser, Lemons, Goodwyn, and Millette, JJ., and Carrico and Russell, S.JJ.

COMMONWEALTH OF VIRGINIA, ET AL.

v.   Record No. 091430

AMEC CIVIL, LLC                              OPINION BY
                                    JUSTICE LEROY F. MILLETTE, JR.
AMEC CIVIL, LLC                           September 16, 2010

v.   Record No. 091662

COMMONWEALTH OF VIRGINIA, ET AL.


FROM THE COURT OF APPEALS OF VIRGINIA

This appeal concerns the performance of a construction contract between AMEC Civil, LLC (AMEC)[1] and the Commonwealth of Virginia, and the Department of Transportation (collectively, VDOT).  In addressing AMEC's twenty-two assignments of error and VDOT's two assignments of error and seven assignments of cross-error in the consolidated cases, we narrow the dispute to five primary issues:  (1) whether AMEC gave timely notice of its claims to VDOT; (2) whether sustained elevated lake water levels constitute a differing site condition under the contract; (3) whether AMEC established its entitlement to home office overhead damages; (4) whether the "Rental Rate Blue Book" was properly used to calculate AMEC's actual costs as a basis for its award of damages; and (5) whether AMEC is

entitled to pre-judgment interest as an element of its damages. We do not address those issues rendered moot by our holdings in this opinion. We affirm the judgment of the Court of Appeals in part, reverse in part, and remand for the circuit court to recalculate damages awarded to AMEC.

## BACKGROUND

In May 2000, VDOT awarded AMEC a $72,479,999.49 contract for the construction of the Route 58 Clarksville Bypass in Mecklenburg County.[2] The central element of the construction project was a bridge (Bridge 616) spanning the John H. Kerr Reservoir (Kerr Lake), which required work to be performed by equipment floating on the water. The project also included ten smaller bridges and several miles of roadway. The time allotted to the project was 41 months, with a projected completion date of November 1, 2003. However, the project was not substantially completed until June 2005. Delays arose primarily from difficulties in the construction of concrete-filled drilled shafts that form the foundation of Bridge 616, and sustained elevated water levels in Kerr Lake.

---

[1] Morse Diesel Civil, LLC changed its name to AMEC Civil, LLC on or about January 1, 2001, and assigned its interests in the contract to AMEC.

[2] In this opinion, we cite VDOT's Metric Road and Bridge Specifications (Jan. 1997) (the Specifications), which are incorporated into the contract. We refer to individual sections as "Specification § ___." In addition to the

In May 2006, AMEC submitted an administrative claim to VDOT pursuant to Specification § 105.16, seeking $24,792,823.43 in additional compensation.[3] AMEC's claim submission outlined what it deemed major impacts, consisting of the 2003-04 winter period, and differing site conditions, including unanticipated, sustained high water levels, and other alleged impacts delaying its performance of the contract. By letter, VDOT denied AMEC's claim.

AMEC then filed its breach of contract action against VDOT in the circuit court, under Code § 33.1-387. Code § 33.1-387 provides in part that "[t]he submission of the claim to the Department of Transportation within the time and as set out in § 33.1-386 shall be a condition precedent to bringing an action under this chapter."[4] The trial was conducted by the circuit

---

Specifications, special provisions were also included in the contract.

[3] According to Specification § 105.16, in pertinent part,

> a written statement describing the act of omission or commission by the Department or its agents that allegedly caused damage to the Contractor and the nature of the claimed damage shall be submitted to the Engineer at the time of occurrence or beginning of the work upon which the claim and subsequent action are based.

[4] Code § 33.1-386 provides that upon the completion of any contract for the construction of any state highway project awarded by the Commonwealth Transportation Board or by the Commonwealth Transportation Commissioner, a contractor may submit a claim for payment under the contract of costs and

court without a jury.  During litigation of the case, the circuit court issued two letter opinions.

The first letter opinion was issued before trial commenced, and addressed VDOT's argument that AMEC failed to satisfy the mandatory requirement for timely written notice, at the time of the occurrence or beginning of the work, of an intent to file claims under Code § 33.1-386 and Specification § 105.16.  The circuit court held that "*any writing* that memorializes the fact the VDOT had *actual notice* of a claim could be sufficient" to satisfy the notice requirement of Specification § 105.16.

The circuit court also held that "strict compliance with legal form," through the requirement in Code § 33.1-386 that AMEC provide VDOT with written notice of its intention to bring claims when such claims first arise, "must yield to achievement of the law's primary purpose" of giving VDOT the opportunity to investigate such claims.  The court determined that "AMEC's claim should not be dismissed since the public policy function of the written notice provision was achieved through actual notice" and, furthermore, that VDOT suffered no prejudice from

---

expenses caused by VDOT's acts or omissions.  Code § 33.1-386 states, in part, that "[t]he claim shall set forth the facts upon which the claim is based, provided that written notice of the contractor's intention to file such claim shall have been given to [VDOT] at the time of the occurrence or beginning of the work upon which the claim and subsequent action is based."

4

AMEC's failure to abide by the statute's written notice provision.

After the trial concluded, the circuit court issued its second letter opinion. The circuit court rendered a "general verdict" and awarded AMEC $21,181,941.00, without interest or attorney's fees. The circuit court revisited the issue of notice, finding that VDOT had written notice through minutes of meetings and memoranda addressing the issues, exchanged between the parties, and concluded that every factual assumption made in its first letter opinion was established by the evidence at trial. VDOT and AMEC each appealed the circuit court's judgment to the Court of Appeals, which reversed in part, affirmed in part, and remanded the case for further proceedings. Commonwealth v. AMEC Civil, LLC, 54 Va. App. 240, 246, 677 S.E.2d 633, 636 (2009). We awarded these appeals.

ANALYSIS

Although AMEC's amended complaint segregated its claim into 12 separate allegations of damages, the Court of Appeals grouped the dispute into four principal issues, which we analyze as we address the issues presented in this appeal.

I. Notice

The Court of Appeals determined that the following claims were barred due to AMEC's failure to fulfill the notice requirement of Code § 33.1-386(A): drilled shaft work; defects

5

in the drilled shaft concrete specification; concrete formwork for foundation caps, piers, and columns; pier 17 foundation cap repair; and work authorized by work orders 4, 6, 7, and 16. AMEC Civil, LLC, 54 Va. App. at 257-60, 677 S.E.2d at 642-43. The Court of Appeals held that, with respect to these claims, the circuit court erred as a matter of law by concluding that AMEC gave timely written notice of its intention to file a claim, because the court dispensed with the statutory requirement of written notice. Id. at 262-63, 677 S.E.2d at 644. The Court of Appeals also held that the circuit court's alternate ruling that written notice had been given from minutes of meetings and memoranda exchanged between the parties is unsupported by the evidence. Id.

AMEC also made a claim for acceleration damages because on some aspects of the contract, AMEC accelerated its efforts to keep on track with expected timelines and claimed damages for its acceleration efforts. The Court of Appeals held that the notice given to VDOT was untimely as to AMEC's claim for acceleration damages incurred before April 2004, but was timely as to acceleration damages incurred after April 2004. Id. at 260-62, 677 S.E.2d at 643-44.

Included in AMEC's complaint was a claim for damages due to a delay over two winter periods. In addressing AMEC's claim of damages, the Court of Appeals concluded that AMEC's notice

6

as to the first winter period was timely.  Id. at 261-62, 677 S.E.2d at 643-44.  Notice of a claim as to the second winter period was not addressed and is, therefore, not at issue.

AMEC, however, contends that VDOT had timely written notice of all of AMEC's claims, that the evidence supported the circuit court's ruling, and that the Court of Appeals erred when it reversed the circuit court's findings of proper notice. AMEC contends that the Court of Appeals erred by failing to consider that notice is timely when given at the time of the occurrence, which can properly be regarded as when a dispute over payment actually arises between the parties.  AMEC argues that the Court of Appeals erred by not considering the adequacy of the written notice in context of the fact that VDOT had actual knowledge and suffered no prejudice, that actual notice followed by written notice may be timely, and that the writings exchanged by the parties documenting the various problems giving rise to the claims, the written requests for additional compensation, and the administrative claim package are sufficient to satisfy Code § 33.1-386.

A.    Notice Under Code § 33.1-386(A)

Code § 33.1-387 gives government contractors the right to file a civil action for any claim "under the contract" that has previously been submitted to and denied by VDOT.  We have stated that this statute must be "strictly construed."  XL

7

*Specialty Ins. Co. v. Commonwealth*, 269 Va. 362, 371, 611 S.E.2d 356, 361 (2005).  Code § 33.1-387 further provides that "[t]he submission of the claim to the Department of Transportation within the time and as set out in § 33.1-386 shall be a condition precedent to bringing an action under this chapter."  By using the language "condition precedent," Code § 33.1-387 makes notice under Code § 33.1-386 a mandatory prerequisite to filing suit against the Commonwealth.

In *Sabre Construction Corp. v. County of Fairfax*, 256 Va. 68, 71, 501 S.E.2d 144, 146 (1998), we addressed language in the Public Procurement Act that allowed bidders to institute a legal action within ten days of an adverse decision of a public body.  We held that when a statute imposes such a "condition precedent" to maintaining a cause of action against the Commonwealth, such limitation is "not merely a procedural requirement, but a part of the newly created substantive cause of action."  *Id.* at 72, 501 S.E.2d at 147.  Thus, notice given in accordance with Code § 33.1-386 is an element of AMEC's prima facie case.

Code § 33.1-386(A) details the proper form and procedure for submitting a claim "under the contract."  Code § 33.1-386(A) requires that the administrative claim "set forth the facts upon which the claim is based, <u>provided that written notice of the contractor's intention to file such claim</u> shall

8

have been given to the Department at the time of the occurrence or beginning of the work upon which the claim and subsequent action is based." (Emphasis added.) Compliance with this notice requirement is mandatory, and part of the substantive cause of action authorized by Code § 33.1-387.

In its first letter opinion, the circuit court ruled that "AMEC did not provide VDOT with written notice of its claims as required by Va. Code Ann. § 33.1-386." Nevertheless, the circuit court held that AMEC had actual notice of AMEC's claims, and concluded that "AMEC's actual notice was a valid substitute for written notice since it effectively accomplished the purpose of the written notice requirement." The circuit court also noted that "although AMEC did not fully comply with the written notice requirement of Va. Code Ann. § 33.1-386, every purpose of the notice provision has been achieved and VDOT has not suffered any prejudice since it is aware of every fact and circumstance 'essential to a just determination of the plaintiff's claim.' "

In its post-trial ruling, the circuit court reaffirmed its ruling that actual notice is an acceptable substitute for written notice under Code § 33.1-386(A). The circuit court also stated:

> The evidence presented at trial proves that the Commonwealth had actual notice of the plaintiff's claims, *ab initio*, that the parties

9

> met on several occasions to discuss the issues
> before the action was filed, that minutes of
> those meetings were kept, and that memoranda
> addressing the issues were exchanged between the
> parties.  It is clear, then, that [VDOT] also
> had written notice of the plaintiff's claims.

In neither of its letter opinions nor in its final order did the circuit court identify the documents that supported its conclusion that the written notice requirement for AMEC's various claims was satisfied, so we must consider whether the record supports the circuit court's blanket endorsement that AMEC complied with the requirement of written notice or whether the Court of Appeals correctly determined that proper written notice was lacking as to certain claims.

## B.   Actual Notice

The Court of Appeals, in addressing the circuit court's ruling regarding actual notice, held that the "circuit court erred in finding that anything other than written notice would suffice" under Code § 33.1-386(A).  AMEC Civil, LLC, 54 Va. App. at 254, 677 S.E.2d at 640.  The Court of Appeals stated that "[t]o permit actual notice to suffice when the governing statute requires written notice would create an exemption that has no basis in the text of the statute."  Id. at 255, 677 S.E.2d at 640 (internal quotation marks omitted).  We agree with the Court of Appeals that written notice is required.

Code § 33.1-386(A) is to be strictly construed, and is clear and unambiguous, stating that contractors "shall" provide "written notice" to VDOT. We hold that actual notice cannot satisfy the written notice requirement in Code § 33.1-386(A), and that written notice is required. See also BBF, Inc. v. Alstom Power, Inc., 274 Va. 326, 331, 645 S.E.2d 467, 469 (2007) ("In construing a statute, we must apply its plain meaning, and we are not free to add [to] language, nor to ignore language, contained in statutes." (internal quotation marks omitted)).

## C. Timely Written Notice

Having concluded that notice under Code § 33.1-386(A) must be written, the issue becomes what constitutes "written notice" under the statute. Code § 33.1-386(A) provides that the "written notice" must announce the contractor's "intention to file [a] claim." The statute also requires that such notice be given at one of two times: 1) "at the time of the occurrence" of the claim; or 2) at the "beginning of the work upon which the claim . . . is based." Code § 33.1-386(A).

Written notice under Code § 33.1-386(A) must be a written document delivered to VDOT clearly stating the contractor's intention to file a claim. We reject AMEC's argument that minutes of meetings constitute written notice under Code § 33.1-386(A). To the extent such minutes may reflect a record

11

of a contractor's stated intent to file a claim, they still do not meet the written notice requirement of Code § 33.1-386(A), because they are merely a recorded summary of what was said at meetings.  At a minimum, to satisfy the written notice requirement, the written document at issue must clearly give notice of the contractor's intent to file its claim and must be "given to [VDOT]" by letter or equivalent communication directed to VDOT at the appropriate time.

In Flory Small Business Development Center v. Commonwealth, 261 Va. 230, 237, 541 S.E.2d 915, 919 (2001), this Court interpreted a notice requirement in the Virginia Public Procurement Act (former Code §§ 11-35 through -80), which required parties making claims under the Act to submit a written notice of intent to file a claim given "at the time of the occurrence or beginning of the work upon which the claim is based."  The relevant language in the Code section at issue in Flory is, for purposes of this case, identical to the notice language in Code § 33.1-386(A).  In interpreting the notice provisions of the Procurement Act, this Court stated that the Act

> does not specifically require that the notice of intent be separate and distinct from the claim itself in time or in form.  By identifying more than one event that triggers the filing of an intent to file a claim, the statute acknowledges that not all claims will arise under the same circumstances.  For example, a dispute over

12

> payment under the contract may not arise until the work is completed, preventing a contractor from giving notice of an intent to file a claim for such payment at the "beginning of the work upon which the claim is based." <u>Thus, the timing and form of an alleged notice of intent pursuant to Code § 11-69(A) requires an examination of the circumstances of each case.</u>

<u>Id.</u> at 238, 541 S.E.2d 919 (emphasis added).

In determining whether AMEC has met its statutory obligation to provide VDOT with written notice, we must examine the documents sent by AMEC to VDOT regarding the various claims alleged. Guided by the principles stated in <u>Flory</u> and the plain language of Code § 33.1-386(A), we will examine the circumstances of each particular claim at issue to determine whether notice is timely and clearly shows AMEC's intention to file a claim.

### 1. Claim Involving Drilled Shaft Work

AMEC's claim for drilled shaft work stemmed from problems it encountered during construction of Bridge 616. The Court of Appeals held that AMEC's notice was untimely because it was given in 2003, two years after the beginning of the work on the drilled shafts. <u>AMEC Civil, LLC</u>, 54 Va. App. at 257-58, 677 S.E.2d at 642. We agree with the Court of Appeals that AMEC's notice for this claim was untimely.

The record contains letters and minutes from meetings exchanged between AMEC and VDOT which show that the parties

13

were aware of problems with the drilled shaft work on Bridge 616 as early as 2000. However, it was not until 2003 that AMEC sent VDOT a letter stating its intention to file a claim for additional compensation due to the problems associated with the drilled shafts. Clearly this notice was not given at the "beginning of the work" on this claim because it was given two years after work began. Code § 33.1-386. The notice was also given long after a legitimate dispute regarding the problems with the drilled shafts arose between the parties, as evinced by the correspondence in the record. Therefore, the notice was also given after the "time of the occurrence" of this claim, rendering it untimely under Code § 33.1-386.

### 2. Claim for Defects in the Drilled Shaft Concrete Specification

During construction of the drilled shafts, AMEC encountered problems with the concrete mix specification established by VDOT pursuant to the contract, requiring AMEC to expend significant amounts of additional time and money. These problems began in 2000, and persisted for more than a year. AMEC claimed that VDOT was responsible for its loss in productivity regarding concrete placement from 2000 until 2002, when VDOT allowed the concrete mix specification to be changed, which solved the problems AMEC was experiencing in laying the concrete.

The Court of Appeals held that there was no evidence presented at trial that AMEC provided VDOT with written notice of its intention to file a claim for damages resulting from the concrete mix specification.  AMEC Civil, LLC, 54 Va. App. at 258, 677 S.E.2d at 642.  We agree with the Court of Appeals that although the record contains letters exchanged between AMEC and VDOT discussing the concrete mix specification and problems associated with it, there is no evidence that AMEC provided VDOT written notice of its intention to file a claim for damages caused by the concrete mix specification.

### 3.  Claim for Concrete Formwork for Foundation Caps, Piers, and Columns

In its administrative claim, AMEC alleged that it suffered damages for problems associated with certain foundation caps, piers, and columns.  With regard to these claims, the Court of Appeals held that there was no evidence that AMEC provided written notice of its intention to file independent claims for these additional costs.  Id. at 259, 677 S.E.2d at 642.

As part of its administrative claim, AMEC asserted a claim for damages resulting from a plan error regarding the construction of concrete shafts for pier 18 on Bridge 616.  In May 2004, AMEC sent VDOT a letter in response to VDOT's denial of AMEC's request for additional compensation resulting from this plan error.  This letter affirmatively states that it

15

shall serve as notice that AMEC will file a claim for damages resulting from this plan error. Therefore, we hold that AMEC did provide VDOT with sufficient written notice for its claim for damages resulting from the plan error for construction of pier 18 on Bridge 616. AMEC's letter clearly stated its intention to file a claim, and it was timely because it was made shortly after VDOT's denial of AMEC's request for additional compensation, which was the "time of the occurrence."

With regard to AMEC's claims for problems associated with other foundation caps, piers, and columns, we agree with the Court of Appeals that the record does not contain evidence that AMEC provided VDOT with written notice of such claims.

### 4. Claim for Pier 17 Foundation Cap Repair

AMEC experienced problems constructing the pier 17 foundation cap on Bridge 616 because fluctuating lake levels caused leakage around the seals of the foundation cap. This leakage continued during placement of the concrete, which ultimately rendered the foundation cap defective. VDOT rejected the foundation cap, and AMEC had to construct a new foundation cap for pier 17.

The Court of Appeals held that the record contained no written notice from AMEC to VDOT indicating its intention to file a claim for work on the pier 17 foundation cap. Id. at

16

259, 677 S.E.2d at 643.  We agree with the Court of Appeals that the record contains no evidence of such notice from AMEC to VDOT.

### 5. Claim for Work Authorized by Work Orders 4, 6, 7, and 16

Work Orders 4, 6, 7, and 16 were authorized by VDOT for additional work that was required during construction, but not provided for in the contract.  These work orders extended the contract end date by a total of 41 days.  In its administrative claim, AMEC alleged that VDOT failed to compensate AMEC for delay costs associated with these work orders.  In addressing this issue, the Court of Appeals held that notice was not timely because AMEC provided such notice in July 2004, which was "after commencement of the work authorized by Work Orders 4, 6, 7, and 16."  Id. at 260, 677 S.E.2d at 643.

We agree that AMEC did not provide timely written notice for its claim regarding Work Orders 4, 6, 7, and 16.  AMEC's notice was not timely under Code § 33.1-386 because it was made after "beginning of the work" on which the claim was based, and after the parties developed a legitimate dispute on this claim, which served as the "time of the occurrence" of this claim.

### 6. Claim for Acceleration Damages

In its administrative claim, AMEC alleged that it is entitled to acceleration damages resulting from its accelerated

17

effort to meet contractual timelines. The Court of Appeals held that AMEC filed a written notice evincing its intention to file a claim in April 2004. Id. at 260-61, 667 S.E.2d at 643. The Court of Appeals held that this "notice was untimely as to acceleration efforts prior to April 2004 but timely as to acceleration efforts after April 2004 to the extent they were reasonably attributable to contractually compensable delays not 'correctly and fully addressed by Work Order No. 39.' "[5] Id. at 262, 677 S.E.2d at 644. The Court of Appeals directed the circuit court on remand to "determine whether any such post-notice efforts existed consistent with our views of the contractual compensability of AMEC's claims." Id.

As an initial matter, we agree with the Court of Appeals that AMEC first provided VDOT with written notice of its intention to file a claim for its acceleration efforts in April 2004. However, this notice was not timely for all of AMEC's acceleration efforts during the contractual period. The notice was not timely for AMEC's acceleration efforts prior to April 2004 because the notice was given after the work that comprised the acceleration began, and after the occurrence of the claim because the parties' dispute regarding the compensability of AMEC's acceleration efforts arose before April 2004.

---

[5] Work Order 39 extended the contract end date to September 3, 2004 "due to the high lake elevations."

18

Nevertheless, AMEC's notice is timely for its claim for acceleration efforts after April 2004 because the notice was given prior to acceleration efforts made after that time. Therefore, AMEC's notice was timely under Code § 33.1-386 for acceleration efforts after April 2004 because it was given at the beginning of the work upon which AMEC's claim was based.

    7.  <u>Claim for Damages During the First Winter Period</u>

The contract originally provided for three winter periods. However, the contract contemplated the possibility of an extension that would push the completion date into later winter periods. Specification § 108.09(b) provides, in pertinent part:

> If there is a delay in the progress of the work due to unforeseen causes . . . and the delay extends the contract time limit into the period between November 30 of one year and April 1 of the following year and working conditions during such period are unsuitable for completion of the work, then consideration may be given to granting an extension of time that will encompass a suitable period during which such work can be expeditiously and acceptably performed.

In March 2003, AMEC sent a letter to VDOT stating its intention to file a claim for damages resulting from extending the contract from November 30, 2003 to April 1, 2004. AMEC contended that this winter period extension was necessary because work orders 6, 7, 12, and 16 extended the contractual

19

period into the winter period, a time when working conditions were unsuitable under Specification § 108.09(b). The Court of Appeals held that this was adequate written notice under Code § 33.1-386(A). AMEC Civil, LLC, 54 Va. App. at 262, 677 S.E.2d at 644. We agree with the Court of Appeals. AMEC's notice was timely because it was given when the parties' dispute regarding the extension for the first winter period arose, which was the time of the occurrence of the claim under Code § 33.1-386.

In summary, we agree with the Court of Appeals that AMEC provided VDOT with timely written notice regarding its claims for damages arising during the first winter period. We also agree with the Court of Appeals that AMEC provided VDOT with timely written notice regarding its acceleration claim as applied to AMEC's acceleration efforts after April 2004. On remand, the circuit court should determine the amount of compensation to which AMEC has proved it is entitled for damages arising during the first winter period and for its acceleration efforts from April 2004 to completion of the contract.

Unlike the Court of Appeals, we hold that AMEC provided VDOT timely written notice of its intention to file a claim for damages resulting from the plan error regarding the construction of concrete shafts on pier 18 on Bridge 616. On

20

remand, the circuit court should award AMEC damages that it incurred regarding this claim.

With respect to the remaining claims discussed above, we agree with the Court of Appeals that AMEC did not provide VDOT with timely written notice of its intention to file a claim.

## II.  Elevated Lake Water Levels

### A.  Issue

The key feature of the contract was the construction of Bridge 616 across Kerr Lake, a dam-controlled reservoir, which is managed by the United States Army Corps of Engineers (the U.S. Army Corps) in part to prevent flooding downstream on the Roanoke River.  The U.S. Army Corps regulates Kerr Lake's water level, usually maintaining a "normal level" of 300 feet.  When the water level rises to 305 feet, the U.S. Army Corps begins releasing water at a certain rate and increases that rate as the water continues to rise.  The lake water level was critical to the construction of Bridge 616 because AMEC could not access the lake and complete the columns that hold up the bridge when the water level was too high.

The contract contemplated routine fluctuations in the water level of Kerr Lake.  Specifically, the Site Information section of the Special Provisions for Drilled Shafts states, in pertinent part, that

21

due to the method of operating the John H. Kerr Reservoir and other factors beyond the control of the Department, the power pool elevation in the reservoir routinely fluctuates by several feet. These fluctuations can take place within a few days. It is the responsibility of the Contractor to avail himself of the historical records of the water levels maintained by the U.S. Army Corps of Engineers, Wilmington District and determine the impacts possible fluctuations may have on planned construction methods and operation.

At trial, Grant Ralston, AMEC's estimate and engineering manager, testified that AMEC knew that the lake water level fluctuated and looked at the historical average lake water levels before determining that AMEC could complete the project even if it had to shut down construction for a while due to high water. Ralston acknowledged that he "knew [Kerr Lake] fluctuated over a long period of time" and that "[t]here was no doubt in [his] mind that the water had been up and down for a long period of time," but asserted that he took into consideration the U.S. Army Corps' information regarding lake water levels while preparing the estimate for the project. Ralston testified that while creating the project schedule, "[they] were aware that [they] would have to deal with this [sic] fluctuating lake elevations, so [they] would have to adjust the amount of time [they were] out there to reflect that." Essentially, AMEC planned to do other tasks during the time periods when the lake water level fluctuated to a higher

level.  According to Ralston, AMEC also properly planned at bid time for the usual high water period between February and June of each year.

However, in 2003, the lake water level remained high for six months, thereby substantially delaying AMEC's work, primarily the construction of Bridge 616.  Charlie H. Guerrant, VDOT's construction manager, who lived in the area of the project his entire life, testified that Kerr Lake had been at higher levels than those encountered in 2003, "but not for that long of a period."  Guerrant described the duration of the elevated lake water levels as unusual and stated that when he began the project, he did not expect the water level to remain as high as it did for the length of time that it did in 2003.  Dale V. Goodman, VDOT's resident administrator, also testified that the duration of the high water at Kerr Lake was an unusual circumstance.  In March 2003, AMEC's project manager, Peter Buchardt, wrote a letter to VDOT informing it that "[c]ontrary to the information provided [on the U.S. Army Corps' website], the levels actually encountered during the past month exceed 307.71 [feet]," and that "[t]hese conditions ha[d] stopped [AMEC's] critical path operations," and advised VDOT that an overall claim for the delays would be submitted.

A year later, as a result of the sustained elevated lake water levels, VDOT issued two work orders extending the project

completion date from December 31, 2003 to October 14, 2004. In an August 2004 letter to AMEC, VDOT asserted that the time extension was granted because "the period of time from approximately March 1, 2003 through July 27, 2003 represented an unusual period of high water levels (148 days)," but VDOT did not award AMEC compensation for the delays.

## B.  Discussion

Specification § 104.03 of the contract, titled "Differing Site Conditions," provided for relief in the form of additional compensation to AMEC when either (1) "subsurface or latent physical conditions" encountered during the work "differ[ed] materially from those indicated in the Contract," (Type I condition) or (2) "unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the Contract" are encountered (Type II condition).

The Court of Appeals held that AMEC's "high-water" differing site condition claim was defeated by the contract as a matter of law. AMEC Civil, LLC, 54 Va. App. at 264, 677 S.E.2d at 645. The Court of Appeals concluded that no Type I condition existed because the elevated lake water levels did not differ from any condition indicated in the contract, as the contract established neither a baseline nor even a range of fluctuations, but instead advised AMEC that the water level of

24

the lake routinely fluctuates by several feet and directed AMEC to review the historical records to take into account non-routine possible fluctuations.  Id. at 265, 677 S.E.2d at 646.  The Court of Appeals also held that no Type II condition existed.  Id. at 266, 677 S.E.2d at 646.  The Court of Appeals reasoned that only an unknown, unforeseeable and unusual physical condition can be a Type II condition under Specification § 104.03.  Id.  In the Court of Appeals' opinion, routine and non-routine water level fluctuations presented known conditional risks associated with the worksite, and such known conditional risks, "whether of an unusual nature or not," should have been factored into AMEC's risk assessment.  Id.

On appeal to this Court, AMEC argues that the sustained periods of elevated lake water levels constituted a differing site condition, because they were sustained high water levels beyond anything recorded by the U.S. Army Corps and unusual and unexpected by everyone, including VDOT representatives. According to AMEC, the Court of Appeals applied an improper standard of review to the circuit court's findings of fact, in reviewing the circuit court's findings de novo.

VDOT responds that the Court of Appeals correctly held that the elevated water levels were neither a Type I or Type II differing site condition.  VDOT maintains that the sustained water levels were not a Type I differing site condition because

they did not differ materially from any indication in the contract, as the contract did not establish a baseline or even a range of fluctuations and did not make any binding representations on the subject.  VDOT argues that the sustained water levels also were not a Type II differing site condition because they were a known, predicable condition, and AMEC knew that there had previously been sustained periods of high water.

In Asphalt Roads & Materials Company, Inc. v. Commonwealth, 257 Va. 452, 457, 512 S.E.2d 804, 806 (1999), this Court stated, when interpreting a similar differing site condition clause, that

> [t]he purpose of the differing site conditions clause and similar clauses, described in a number of cases as the "changed conditions clause," has been stated in several cases.  The North Carolina Court of Appeals, for example, has stated that its purpose is "[t]o encourage low, competent bids," Ray D. Lowder, Inc., v. North Carolina State Highway Comm'n, 217 S.E.2d 682, 696, (N.C. Ct. App.) cert. denied, 218 S.E.2d 467 (N.C. 1975).

> Similarly, the Court of Claims stated that the purpose of the clause was:

> > [T]o take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk.  They will have no windfalls and no disasters.  The Government benefits from more accurate bidding, without inflation for risks which may not

26

> eventuate.  It pays for difficult
> subsurface work only when it is encountered
> and was not indicated in the logs.

Foster Constr. C. A. & Williams Bros. Co. v.
United States, 435 F.2d 873, 887 (Ct. Cl. 1970).

The differing site conditions clause is intended to "shift the risk of adverse subsurface or latent physical conditions from the contractor, who normally bears such risk under a fixed-price contract, to the government."  Olympus Corp. v. United States, 98 F.3d 1314, 1316 (Fed. Cir. 1996).  The differing site conditions clause is designed to ensure low, competent bids.  Asphalt Roads & Mat'ls Co., 257 Va. at 457, 512 S.E.2d at 806.

To determine whether a Type I differing site condition existed requires the court first to interpret the contract, which is a legal inquiry reviewed de novo on appeal, and then to engage in a factual inquiry.  Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001); Turnkey Enterprises, Inc. v. United States, 597 F.2d 750, 755 n.12 (Ct. Cl. 1979).  For a contractor to show the existence of a Type I differing site condition, "the contractor must prove, by a preponderance of the evidence, that the conditions indicated in the contract differ materially from those it encounters during performance."  Randa/Madison Joint Venture III, 239 F.3d at 1274 (quoting H.B. Mac, Inc. v. United States, 153 F.3d 1338,

27

1345 (Fed. Cir. 1998))(internal quotation marks omitted).  The contract must contain a "reasonably plain or positive indication that the conditions to be encountered would be other than those actually encountered at the time of performance," Turnkey Enterprises, Inc., 597 F.2d at 754-55, and "[t]he conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding."  Meyers Cos., Inc. v. United States, 41 Fed. Cl. 303, 309 (1998) (quoting Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987)) (internal quotation marks omitted).

Analysis of whether a Type II differing site condition exists does not require contract interpretation, and is a factual determination.  Randa/Madison Joint Venture III, 239 F.3d at 1277; Turnkey Enterprises, Inc., 597 F.2d at 758.  In order to qualify as a Type II differing site condition, "the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his [or her] study of the contract documents, his [or her] inspection of the site, and his [or her] general experience[,] if any, as a contractor in the area."  Randa/Madison Joint Venture III, 239 F.3d at 1276 (quoting Perini Corp. v. United States, 381 F.2d 403, 410 (Ct. Cl. 1967)) (internal quotation marks omitted).  The contractor must show that "it did not [know] about the

physical condition, that it could not have anticipated the condition from inspection or general experience, and that the condition varied from the norm in similar contracting work." Walser v. United States, 23 Cl. Ct. 591, 593 (1991).

We hold that under the plain language of the Specifications, the sustained elevated water levels did not constitute a Type I differing site condition, as the water levels were not a subsurface or latent physical condition in existence at the time that the contract was executed. We therefore do not need to engage in an interpretation of the Site Information section of the Special Provisions for Drilled Shafts or to determine if the sustained elevated water levels differed materially from what was represented in the contract.

We conclude, however, that the sustained elevated water levels formed a Type II differing site condition under Specification § 104.03, as they were an unknown physical condition of an unusual nature, which differed materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the contract. The Court of Appeals erred by deciding this issue as a matter of law, as an inquiry into whether a Type II differing site condition existed presents a question of fact. Randa/Madison Joint Venture III, 239 F.3d at 1277; Turnkey Enterprises, Inc., 597 F.2d at 758.

We stated in Asphalt Roads & Materials Company, Inc. that "in the absence of clear evidence to the contrary in the record, we presume that [the circuit court] correctly applied the provisions of [Specification] § 104.03 to the facts and that, in doing so, it resolved any conflict in the facts in favor of the contractor."  257 Va. at 458 n.6, 512 S.E.2d at 807 n.6.  This presumption is bolstered by ample evidence in the record, from both AMEC's and VDOT's witnesses, that the sustained elevated water levels were of an "unusual duration," presenting an "unusual circumstance," and not ordinarily encountered as inherent in the construction work provided for in the contract.  Moreover, the unknown physical condition was not one that could be reasonably anticipated by AMEC from its study of the contract, inspection of the site, or general experience as a contractor in the area.  Randa/Madison Joint Venture III, 239 F.3d at 1276.

The risk of sustained high water in Kerr Lake was unusual, and not one that AMEC was charged with the responsibility of including in its bid.  AMEC properly incorporated only the costs associated with routine fluctuations after consulting the U.S. Army Corps' website and reviewing historical water level information.  VDOT benefited from more accurate bidding, without inflation for a risk that might not have eventuated, but now must bear the costs associated with a risk that came to

30

fruition and adversely impacted AMEC's ability to complete construction as scheduled.

Additionally, we disagree with VDOT's assertion that the sustained elevated water levels were a natural event and therefore an act of God. It is undisputed that Kerr Lake is a dam-controlled reservoir and that its water level is managed by the U.S. Army Corps, partly to prevent flooding downstream on the Roanoke River. The sustained elevated water levels were not a natural event, as they resulted from the U.S. Army Corps' exercise of its control over the dam, which dictated the water level of Kerr Lake. Thus, VDOT's contention that the sustained elevated water levels are barred from consideration as a differing site condition on this basis is unsupported by the evidence.

### C.   Calculation of Damages

With regard to calculation of AMEC's additional compensation, AMEC argues that it is entitled to compensation on a force account basis per Specification § 109.05 for damages it sustained from the elevated lake water levels. AMEC contends that Specification § 109.05 provides that contractors will be paid on a force account basis for extra work caused by a differing site condition when the parties cannot agree on a price for such extra work.

31

VDOT argues that AMEC is not entitled to damages as calculated under Specification § 109.05 because VDOT did not require AMEC to perform work on a force account basis. Additionally, VDOT asserts that "AMEC did not seek recovery based on work VDOT ordered AMEC to perform on a force account basis."

Specification § 109.05, titled "Extra and Force Account Work," provides cost mark-ups for "extra work" and "force account work" performed by contractors. Under Specification 101.02, "Extra work" is defined as an "item of work that is not provided for in the Contract as awarded but that is found to be essential to the satisfactory fulfillment of the Contract within its intended scope." Although the sustained elevated water levels caused construction delays and problems, the work performed, namely the construction of Bridge 616, was work provided for in the contract. Thus, AMEC's claim for damages caused by the sustained elevated lake water levels is not a claim for "extra work" because the work at issue was provided by the contract.

"Force account work," under Specification § 101.02, is defined as "[p]rescribed work of a contractual status performed by the Contractor and compensated for as specified in Section 109.05." Specification § 109.05, in pertinent part, provides:

> Extra work performed in accordance with the
> requirements of Section 104.03 will be paid for
> at the unit prices or lump sum specified in the
> work order.  In lieu of such agreement, the
> Department may require the Contractor to do such
> work on a force account basis . . . .

The work performed by AMEC, which was required by the contract but complicated due to the elevated lake water level, was also not "force account work" because it was neither additional work prescribed by VDOT, nor work that VDOT ordered be done on a "force account basis."  Therefore, AMEC is not entitled to compensation under Specification § 109.05 for damages caused by the elevated lake water level.

Specification § 104.03, however, provides relief to contractors when differing site conditions impede performance of the contract.  This Specification contains a clause that allows for an adjustment to the contract for additional costs resulting from differing site conditions, which states:

> Upon written notification, the Engineer will
> investigate the conditions, and if it is
> determined that the conditions materially differ
> and cause an increase or decrease in the cost or
> time required for the performance of any work
> under the Contract, an adjustment, excluding
> anticipated profits, will be made and the
> Contract modified in writing accordingly.

Therefore, Specification § 104.03 provides that "an adjustment, excluding anticipated profits" is the proper measure of damages for increased cost or time for performance of work caused by a differing site condition.

Upon remand, the circuit court shall calculate the appropriate adjustment to the contract, excluding any profit, based on costs incurred by AMEC through increased time required to perform the contract, as a result of sustained elevated lake water levels.

### III.  Home Office Overhead

The Court of Appeals held that AMEC failed to prove that it could not recoup home office overhead costs from other revenue-producing work.  AMEC Civil, LLC, 54 Va. App. at 275, 677 S.E.2d at 651.

AMEC argues that the Court of Appeals improperly created an unreasonable standard of proof concerning home office overhead, and should have examined whether the circuit court's findings were plainly wrong or unsupported by the evidence. AMEC asserts that because it kept its labor and equipment on site and performing non-critical and less productive work, the evidence showed that AMEC could not recoup the project's pro rata share of home office overhead elsewhere.

VDOT contends that AMEC failed to prove it could not reasonably recoup its home office overhead from other revenue-producing work during the periods of delay and therefore was not entitled to an award of those expenses.  According to VDOT, the circuit court made no findings of fact or conclusions of law on AMEC's entitlement to home office overhead, and the

circuit court's general verdict was contrary to the evidence and to the contract.

This Court explained in Fairfax County Redevelopment and Housing Authority v. Worcester Bros. Co., Inc., that

> [h]ome office expenses, commonly called overhead, include those costs that a contractor must expend for the benefit of its business as a whole.  These expenses include, for example, the salaries of office staff, accounting expenses, dues and subscriptions, equipment costs, and utility services.  Unabsorbed home office expenses comprise "those overhead costs needlessly consumed by a partially or totally idle contractor.  A contractor continues to incur overhead costs during periods of reduced activity or delay on a particular contract. When this occurs, the 'reduced activity' contract no longer 'absorbs' its share of overhead costs."

257 Va. 382, 387-88, 514 S.E.2d 147, 150 (1999) (quoting Michael W. Kauffman and Craig A. Holman, The *Eichleay* Formula: A Resilient Means for Recovering Unabsorbed Overhead, 24 Pub. Contr. L.J. 319, 321 (1995)).  Entitlement to home office overhead is a question of fact.  Id. at 388, 391, 514 S.E.2d at 151-52.

To prove that it suffered unabsorbed overhead damages, a contractor is not required to show that its overhead was increased due to the delay, "but only that it could not otherwise reasonably recoup its pro rata home office expenses incurred while its workforce was idled by the delay."  Id. at 388, 514 S.E.2d at 151.

35

We agree with the Court of Appeals that AMEC did not meet its burden of proving that it could not reasonably recoup its home office overhead from other revenue-producing work. The record contains no evidence addressing this issue. The evidence presented by AMEC consisted of a mathematical model that assumed that AMEC could not have directed employees to other revenue-producing work, including other work under this contract. AMEC's expert merely calculated a per diem rate of delay and multiplied the rate by the number of days of delay. Neither AMEC's expert or any fact witnesses presented any evidence that AMEC could not have recouped its home office overhead from other revenue-producing work. Lockheed Info. Mgmt. Systems Co., Inc. v. Maximus, Inc., 259 Va. 92, 116, 524 S.E.2d 420, 433 (2000). Therefore, AMEC is not entitled to home office overhead expenses.

### IV. Calculation of Actual Costs

The equipment costs included in AMEC's claim were priced according to the "Rental Rate Blue Book" (the Blue Book), utilizing specific portfolios of equipment for all the elements of work that were performed. AMEC based its use of the Blue Book on Specification § 109.05. Pursuant to Specification § 109.05(d),

> **Equipment:** . . . The Contractor will be paid hourly rental rates for pieces of machinery, equipment, and attachments necessary

36

> for prosecution of the work that are approved
> for use by the Engineer.  Hourly rental rates
> will not exceed 1/176 of the monthly rates of
> the schedule shown in the <u>Rental Rate Blue Book</u>
> modified in accordance with the <u>Blue Book</u> rate
> adjustment tables that are current at the time
> the force account is authorized.  Adjustment
> factors or rate modifications indicated on area
> maps in the <u>Blue Book</u> will not be considered
> when acceptable rates are determined. . . .

AMEC made no adjustments to the Blue Book rates for age or region of the equipment.

The Court of Appeals held that the circuit court was not plainly wrong in accepting the Blue Book as a standard used in the profession to estimate actual costs for owner-furnished equipment.  <u>AMEC Civil, LLC</u>, 54 Va. App. at 277 n.32, 677 S.E.2d at 652 n.32.  Therefore, the Court of Appeals held that, on remand, the Blue Book estimates could be relied upon by the circuit court as a basis to determine owner-furnished equipment costs.[6]  <u>Id.</u>

It is undisputed that the measure of damages in this case is actual cost.  However, the parties dispute whether the Blue Book is an appropriate method of proving actual cost.

VDOT contends that AMEC did not make out a prima facie case of damages because AMEC did not prove actual cost.  VDOT argues that the Blue Book provides only an estimate of costs

---

[6] The Court of Appeals remanded to the circuit court to determine whether the evidence provides a reasonable basis to

and does not prove actual cost, which is the measure of damages required by Specification § 105.16.[7] Additionally, VDOT argues that if it intended to allow AMEC to use the Blue Book to calculate costs for claims under Specification § 105.16, VDOT would have included a provision allowing the use of the Blue Book.

Lastly, VDOT asserts that, assuming AMEC's use of the Blue Book was appropriate, AMEC failed to make adjustments to the Blue Book's estimated base equipment rental rates taking into account such factors as the age of the equipment, the region where the equipment was used, and purchase price. According to VDOT, these adjustments would generally reduce the rental rates to more closely approximate actual costs.

AMEC contends that, even if Specification § 109.05 is inapplicable, the Blue Book was properly used to establish AMEC's actual damages for owner-furnished equipment under

---

establish the actual costs AMEC incurred. AMEC Civil, LLC, 54 Va. App. at 277, 677 S.E.2d at 652.

[7] Specification § 105.16, "Submission and Disposition of Claims," provides, in pertinent part, that "[a]t the time of occurrence or prior to beginning the work, the Contractor shall furnish the Engineer an itemized list of materials, equipment, and labor for which additional compensation will be claimed. Only actual cost for materials, labor, and equipment will be considered." It further provides that, "[u]pon completion of the Contract, the Contractor may, within 60 days from the time the final estimate is paid, submit to the Department a written claim . . . for the amount he deems he is entitled to under the Contract. . . . Only actual cost for materials, labor, and equipment will be considered."

Specification § 105.16.  AMEC asserts that the Blue Book rates incorporate ownership and operating costs, including depreciation costs, insurance, property taxes, costs of facilities capital, repairs, and fuel.  AMEC maintains that expert testimony established that the Blue Book is accepted as a standard used in the profession for determining owner-furnished equipment costs.  AMEC argues that the evidence at trial also supported the circuit court's finding that the Blue Book rates accurately represented AMEC's actual equipment costs.

Theodore E. NeSmith testified as AMEC's expert on construction cost accounting and construction damage calculations.  NeSmith is a certified public accountant and a certified valuation analyst for a certified public accounting firm that specializes in forensic accounting and business valuation, primarily in two areas:  business damages and construction damages.  AMEC hired NeSmith to "review, assess, and to the degree necessary, modify the damage claim that AMEC had already prepared relating to [the] project."

NeSmith testified as an expert that he has used the Blue Book to calculate costs incurred by a contractor on multiple occasions.  With regard to the integrity of utilizing the Blue Book, NeSmith stated, "if the objective is to get to the true cost number of operating owned equipment, clearly Blue Book is

39

the most reflective of that." When VDOT objected to NeSmith's testimony about the integrity of the Blue Book, the circuit court stated, "It seems to me it's been established thus far that this Blue Book is a standard used in the profession for estimating these costs, and I don't think you need to go further than that unless the validity is challenged by the defense." VDOT did not respond. NeSmith testified that the equipment costs claimed by AMEC were "equivalent to and represent[] the damages that were experienced by AMEC."

The record supports the circuit court's conclusion that the Blue Book represents an industry standard for determining the cost of operating owned equipment. According to the unchallenged expert testimony, use of the Blue Book is an accepted method to prove actual costs. Thus, the expert testimony has established that the Blue Book is an appropriate methodology of calculation so that VDOT's challenge is a challenge to the weight of the evidence rather than to its admissibility. Because the Blue Book is recognized as an appropriate tool for determining owner-furnished equipment costs for purposes of proving actual costs, we hold that the Court of Appeals properly affirmed the circuit court's acceptance of the Blue Book for the purpose of calculating such costs.

The circuit court did not award AMEC pre-judgment interest "because it [could] find no authority giving it jurisdiction to do so."  The Court of Appeals held the circuit court properly denied AMEC's request for pre-judgment interest, as Code § 33.1-386(A) says nothing about an allowance of pre-judgment interest on contractually recoverable costs and expenses.  AMEC Civil, LLC, 54 Va. App. at 279-80, 677 S.E.2d at 652-53.

AMEC argues that the Court of Appeals erred by determining that VDOT was not liable for pre-judgment interest and that a separate and distinct waiver of sovereign immunity was required before AMEC could recover pre-judgment interest.  AMEC maintains that the Commonwealth is like any other citizen and is liable for interest on contractual debts.

VDOT contends that it is not liable for pre-judgment interest, as the Commonwealth is not liable for interest absent express statutory authority or a contract provision explicitly imposing such liability, and neither Code § 8.01-382 nor the contract make VDOT liable for pre-judgment interest.  According to VDOT, the Commonwealth does not waive its immunity simply by entering into a contract.

We have previously held that the Commonwealth is "as liable for its contractual debts as any citizen would be." Wiecking v. Allied Medical Supply Corp., 239 Va. 548, 553, 391

41

S.E.2d 258, 261 (1990).  However, in order for the Commonwealth to be liable for pre-judgment interest, there must be a statutory or contractual waiver of sovereign immunity with respect to this distinct item of damages.

Nearly a century ago, this Court stated, "it has never been held by this court that a claim asserted against the State or a county bears interest where there is no provision in the statute or authorized agreement creating the liability for the payment of interest."  City of Lynchburg v. Amherst County, 115 Va. 600, 608, 80 S.E. 117, 120 (1913).  We continue to adhere to this long-standing rule.  Thus, in the absence of a statutory or contractual waiver, the Commonwealth and its agencies have sovereign immunity from liability for pre-judgment interest on contract claims.  In this case, there has been no statutory or contractual waiver of VDOT's sovereign immunity and, therefore, the Court of Appeals correctly affirmed the circuit court's denial of pre-judgment interest sought by AMEC.

CONCLUSION

For the reasons stated, we will affirm in part and reverse in part the judgment of the Court of Appeals.  We will affirm the Court of Appeals' judgment on all but two issues.  Specifically, we will reverse the Court of Appeals' judgment that the sustained elevated lake water levels did not

42

constitute a differing site condition, and that AMEC did not provide timely written notice of its claim for plan error regarding the construction of concrete shafts for pier 18 on Bridge 616.

We will remand the case to the Court of Appeals with instructions to remand the case to the circuit court for further proceedings consistent with this opinion. On remand, in deciding the issues addressed by this Court, the circuit court shall review the evidence already presented in the case and calculate damages to which AMEC is entitled for the following claims: plan error regarding the construction of concrete shafts for pier 18 on Bridge 616; acceleration damages incurred after April 2004; and delay damages resulting from the sustained elevated lake water levels, as calculated per Specification § 104.03, which shall constitute actual costs incurred by AMEC, excluding profit. Additionally, in computing owned equipment costs, the circuit court shall calculate a damage award based upon Blue Book estimates, as testified by expert witnesses, which reflect actual costs.

On remand, the circuit court shall also consider the Court of Appeals' holdings that were not challenged on appeal to this Court. Specifically, the circuit court shall follow the Court of Appeals' direction to: review the record and make findings on whether AMEC is entitled to damages for conditions during

43

either or both of the winter periods, and if the court finds in favor of AMEC, identify the contractual basis of such award and make factual findings as to any damages awarded; review the record and make findings on whether AMEC proved its entitlement to damages resulting from the boulders at bridge B640; and award damages associated with AMEC's bond premium.  Finally, on remand, the circuit court shall apply actual costs as the measure of damages for the claims surviving appeal.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>