COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Alston and Senior Judge Coleman
Argued at Richmond, Virginia


COMMONWEALTH OF VIRGINIA AND
 DEPARTMENT OF TRANSPORTATION
                                                    MEMORANDUM OPINION[*] BY
v.      Record No. 2134-11-2                        JUDGE LARRY G. ELDER
                                                    MAY 22, 2012
AMEC CIVIL, LLC


                FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
                            Charles E. Poston, Judge Designate

                Stephen G. Test (Sarah K. McConaughy; Richard Tyler McGrath,
                Senior Assistant Attorney General; Williams Mullen; Office of the
                Attorney General, on briefs), for appellants.

                J. Tracy Walker, IV (Anne Marie Whittemore; Richard C.
                Beaulieu; Gregory S. Martin; McGuireWoods LLP; Gregory S.
                Martin & Associates, PA, on brief), for appellee.


        This case involves a contract dispute between the Commonwealth and the Department of

Transportation (hereinafter collectively VDOT) and AMEC Civil, LLC (hereinafter AMEC),

over the construction of the Route 58 Clarksville Bypass in Mecklenburg County.  The contract

price was just under $72.5 million.  When completion of the project was delayed by a year and

seven months, AMEC submitted an administrative claim to VDOT for additional compensation

of over $24 million.  VDOT denied the claim.

        AMEC challenged the denial in a civil suit as permitted by statute.  The circuit court

awarded AMEC approximately $21 million.  Both parties appealed to this Court, which affirmed

in part, reversed in part, and remanded.  VDOT v. AMEC, 54 Va. App. 240, 677 S.E.2d 633

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(2009). Both parties then appealed to the Virginia Supreme Court, which also affirmed in part, reversed in part, and remanded to the circuit court "to recalculate damages awarded to AMEC." VDOT v. AMEC, 280 Va. 396, 403, 699 S.E.2d 499, 503 (2010). After the circuit court made a revised award of approximately $12 million, VDOT noted the instant appeal.

In this appeal, VDOT assigns error to numerous aspects of the circuit court's revised calculation of damages. VDOT contends the court should have applied judicial estoppel, *see infra* Part II.A., or law-of-the-case principles, *see infra* Part II.B., to hold on remand that AMEC was bound by the testimony of its sole damages expert, Theodore NeSmith, that its damages were as reflected in NeSmith's exhibits and that the court erred in relying on the testimony of AMEC's assistant project manager Bryon Breese and the document he prepared for purposes of the administrative claim. VDOT contends further that the circuit court erred in accepting and relying on opinion testimony from Breese over VDOT's objection, *see infra* Part II.C., and in accepting estimates of costs rather than actual costs as proof of damages on remand, *see infra* Part II.D. Next, it contends the circuit court erred in awarding forty days of damages for delays caused by an unexpected site condition, boulders, contending AMEC failed to prove its entitlement to more than eight days of damages. *See infra* Part II.E.1. Further, it contends the circuit court erroneously awarded damages to AMEC for requiring it to work through the winter of 2003 to 2004 when AMEC failed to provide prima facie evidence of the actual weather and the extent of its impact on critical activities for specific days and failed to keep daily records and provide an itemized list of equipment, labor, and materials as required by the contract. *See infra* Part II.E.2. Finally, it challenges the way in which the circuit court calculated various components of the damages award, including delay damages for the boulders, the first winter and high water periods, *see infra* Part II.E.1 to E.3., as well as some of the acceleration damages and extra work required due to an error in the plans, *see infra* Part II.E.4 to E.5. In an assignment of

cross-error, AMEC contends the circuit court erred in denying its claim for post-judgment interest. *See infra* Part II.F.

We hold the circuit court did not err in concluding it was free to use Breese's rather than NeSmith's data and calculations on remand. We hold further the court did not err in concluding AMEC was entitled to recover for the entire 121-day period of winter work for the 2003-2004 winter season. However, we hold the circuit court erred in awarding AMEC damages for forty days of delay due to boulders when the evidence established only eight days of delay. Finally, we hold the circuit court erred in interpreting the meaning of actual costs for purposes of proving damages and that this error requires the recalculation of several components of its damages award. As to AMEC's cross-assignment of error challenging the circuit court's refusal to award post-judgment interest, we hold AMEC waived that claim by failing to raise it in the first appeal. Thus, we affirm in part, reverse in part, and remand for a recalculation of damages consistent with this opinion.

## I. BACKGROUND

VDOT awarded AMEC this approximately $72.5 million project in May 2000. The central element of the project was a bridge (bridge 616) spanning the John H. Kerr Reservoir (Kerr Lake), which required work to be performed from equipment floating on the lake. The project also included ten smaller bridges (including bridge 640) and about four miles of roadway. The time allotted for the project was forty-one months, with a projected completion date of November 1, 2003. However, the project was not substantially complete until June 2005, approximately nineteen months after the original completion date. Delays arose primarily from sustained elevated lake water levels and difficulties with the construction of concrete-filled drilled shafts that formed the foundation of bridge 616, which pushed construction into two additional winter periods. AMEC sought to recover for these delays.

- 3 -

In 2006, AMEC submitted an administrative claim to VDOT for $24,792,823.43. That claim was prepared mostly by Bryon Breese, AMEC's assistant project manager at the site. After VDOT denied the administrative claim, AMEC filed the instant contract action. At trial, AMEC introduced the administrative claim and offered testimony from Breese about its contents. VDOT objected to portions of Breese's testimony on the ground that the testimony involved opinion and AMEC had not identified Breese as an expert in advance of trial. The circuit court held that Breese, as the author of the document containing facts, was qualified to testify about those facts and that it "[did not] see this [as] an expert testimony issue."

Breese's testimony established that he served as assistant project manager from October 2002 through project completion in 2005. In addition to quality problems with structural steel work performed by subcontractor Mitsubishi, the project began to face elevated lake levels in early 2003, which had "a significant impact" on AMEC's ability to proceed with bridge 616. The project, which was scheduled to be completed by November 1, 2003, was not substantially completed until June 2005.

Breese's duties included managing the project's schedule and budget, including the purchasing of materials, and overseeing data entry into the software program for managing those items. He testified about AMEC's cost accounting system and software and how the data was gathered and input into the system.

Breese testified about the document he prepared to support AMEC's administrative claim (introduced into evidence as AMEC's exhibit 487), in which he calculated four general categories of damages: (1) delay damages, (2) acceleration, (3) loss of productivity, and (4) other remaining open items. As to the category over which the biggest dispute arose, delay

damages, Breese testified he used data from the period of December 2002 to November 2004[1] and calculated monthly totals for various categories of time-related job site overhead. Those categories included "management and staff salaries, time relate[d] office space, equipment, supplies and consumables[,] and service equipment." Using the total figures for each of those categories for that twenty-four-month period, which included 731 days, he calculated a daily rate for job site overhead and multiplied that daily rate by 586, the number of days of delay from November 1, 2003, to June 9, 2005. He then applied various credits due as a result of proceeds received from resolution of the problems caused by Mitsubishi, a subcontractor responsible for installing at least some of the structural steel on the project.

AMEC also offered the testimony of Theodore NeSmith, a certified public accountant and certified valuation analyst. NeSmith was the only person AMEC asked to qualify as a damages expert for construction cost accounting and construction damage calculations. NeSmith said he was tasked with reviewing AMEC's existing damages report, which had been prepared by Breese. In the course of doing so, he reviewed and performed "[e]xtensive testing" on AMEC's job cost data, which was recorded on time sheets and invoices and then entered into AMEC's software program. He found the job cost data to be reliable with regard to labor, materials, subcontracts, and leased equipment.

With regard to the job cost data for owned equipment, NeSmith "[found] some problems" with the records which resulted in their understating equipment use. He said such problems were

---

[1] When asked why he selected that time frame, Breese testified, *incorrectly*, "that's the period of time in which we were delayed so the original project completion was November '02." The project was scheduled, instead, to be completed November 1, 2003, and was not substantially completed until June 2005, more than six months after the November 2004 date which served as the cutoff for the period of delay Breese examined in detail. Breese said nothing to indicate expressly that he was aware of his error. He also said, however, that his figures "go all the way out to November '04. So that's *a* period of delay." (Emphasis added). This language permits the inference that Breese intended to examine only a snapshot period of the delay, not the entire period, in order to calculate an average daily delay rate.

normal for the industry, and he opined that any deficiencies were not problematic because Blue Book rates for equipment, which estimated actual costs, rather than actual usage figures were going to be used. NeSmith testified he performed a "comparative analysis" of labor costs and equipment usage to confirm the expected "correlation of reasonableness between ultimate labor overage and ultimate equipment overage."

NeSmith testified that, overall, he was "extremely impressed" with the quality of Breese's report "recognizing that his background is primarily that of an engineer." He also said Breese did a very good job of not duplicating costs by providing credits in his calculations where there was overlap in the various categories.

NeSmith did make downward adjustments in Breese's calculations for three different categories of damages. He eliminated approximately $800,000 of damages Breese had included in the delay claim for use of each of the specific pieces of AMEC-owned equipment. NeSmith testified Breese's figure for use of AMEC-owned equipment was based on Breese's position that much of AMEC's equipment was being worked in excess of the 176 hours per month upon which the Blue Book rates were based. As a result, Breese concluded that "there didn't need to be a full credit" for the sums recovered from Mitsubishi. NeSmith testified he "took . . . a much more conservative approach" by crediting the full amount of the sums recovered, which eliminated that $800,000 from the delay damages claim. For "the exact same" reasons, NeSmith eliminated an additional approximately $2 million based on equipment use included in the Mitsubishi matter. NeSmith testified that he "did not consider [Breese's] assessment to be wrong" and that he made the changes in order "to take the conservative approach" to avoid "any criticism." NeSmith testified that using the Blue Book is most reflective of the true cost of operating owned equipment. NeSmith also eliminated approximately $400,000 from Breese's calculation of "field overhead" because it contained "some items that were not truly, in [his]

opinion, what [he] would call time related." NeSmith testified the three deductions reduced the total damages claimed by about $3.3 million.

NeSmith's supporting documentation was admitted into evidence as exhibits 610.4, 612, 612.1, and 612.3. For purposes of calculating extended field office or job site overhead, NeSmith, like Breese, calculated an average daily rate rather than relying on actual costs for the period of delay from November 1, 2003, forward. NeSmith, like Breese, used data from the twenty-four-month period from December 1, 2002, to November 30, 2004.

NeSmith's exhibits showed claimed damages, not including pre-judgment interest, of $21,181,941. AMEC's proposed conclusions sought damages in that same amount, not including pre-judgment interest, based on NeSmith's exhibit 610.4. The circuit court rendered a "general verdict" for precisely that amount, and it expressly denied the claim for interest. Thus, it appears the circuit court adopted the evidence of AMEC's only expert witness, Theodore NeSmith, as to damages.

On appeal, the Supreme Court held with respect to the calculation of damages from elevated lake water levels, that VDOT contract specification § 109.05,[2] which contained provisions allowing profit "mark-ups" for "extra work" and "force account work," used by both Breese and NeSmith, did not apply. 280 Va. at 420-21, 699 S.E.2d at 513. Instead, it held that specification § 104.03 applied. That specification "provides relief to contractors when differing site conditions impede performance of the contract" and permits damages in the form of "'an adjustment, excluding anticipated profits.'" Id. at 421, 699 S.E.2d at 513 (quoting specification § 104.03). The Court ordered that "[u]pon remand, the circuit court shall calculate the appropriate adjustment to the contract, excluding any profit, based on costs incurred by AMEC

---

[2] VDOT's Metric Road and Bridge Specifications (Jan. 1997) (hereinafter the specifications or specification § X) (VDOT exhibit 372.1) were expressly incorporated into the contract between VDOT and AMEC. See 280 Va. at 403 n.2, 699 S.E.2d at 503 n.2.

through increased time required to perform the contract, as a result of sustained elevated lake water levels." Id. at 421, 699 S.E.2d at 513-14. It held further that, based on a lack of proof in this case, AMEC was not entitled to recover home office overhead expenses. Id. at 421-23, 699 S.E.2d at 514. Next, it noted the measure of damages is "actual cost." Based on what it said was unchallenged expert testimony from NeSmith, it held that "use of the Blue Book is an accepted method to prove actual costs," id. at 424-25, 699 S.E.2d at 515-16, and it directed that "in computing owned equipment costs, the circuit court shall calculate a damage award based upon Blue Book estimates, as testified by expert witnesses, which reflect actual costs," id. at 427, 699 S.E.2d at 517. Finally, it directed that "[o]n remand, in deciding the issues addressed by this Court, the circuit court shall review the evidence already presented in the case and[, on that basis,] calculate damages to which AMEC is entitled." Id.

On remand, the circuit court used AMEC's exhibit 487, prepared by Breese, to calculate most of the damages. It largely ignored the evidence of NeSmith. For example, it used an average daily rate figure taken from Breese's exhibit 487 to calculate the delay damages caused by the boulders. It also determined AMEC was entitled to damages only for the first winter period and used figures from Breese's exhibit 487 to determine the delay damages incurred. It awarded damages for some of the delay caused by high water, used Breese's actual data for specific months, and prorated those figures to determine the amount of damages to award. As to acceleration damages, based on the Supreme Court's ruling that AMEC was entitled to recover only those acceleration damages incurred after April 2004, the circuit court prorated AMEC's acceleration damages from actual cost amounts provided for a period longer than the period for which the Supreme Court held they were awardable. The circuit court made a total award on remand of $12,007,953.64. Slip op. at 25, 2011 Va. Cir. LEXIS 83, at *50.

II.  ANALYSIS

A.  THE MANDATE RULE, JUDICIAL ESTOPPEL, AND DAMAGES

VDOT contends the mandate rule and judicial estoppel principles limited the circuit court's discretion on remand.

VDOT asserts that the Supreme Court's mandate compelled the circuit court, on remand, to accept NeSmith's testimony over Breese's.  Under the "mandate rule," a "trial judge is bound by a decision and mandate from [an appellate court], unless [the court] acted outside [its] jurisdiction.  A trial court has no discretion to disregard [a] lawful mandate."  Rowe v. Rowe, 33 Va. App. 250, 257, 532 S.E.2d 908, 912 (2000).

> [I]t is indisputable that a lower court generally is "bound to carry the mandate of the upper court into execution and [may] not consider the questions which the mandate laid at rest."  [Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 168 (1939)].  [The "mandate rule"] compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court. . . .  Thus, when [an appellate] court remands for further proceedings, a [lower] court must . . . "implement both the letter and spirit of the . . . mandate, taking into account [the appellate court's] opinion and the circumstances it embraces."  [United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993)].

United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993); see also Strayer v. Long, 83 Va. 715, 717-18, 3 S.E. 372, 373-74 (1887).

The Supreme Court directed that "in computing owned equipment costs, the circuit court *shall* calculate a damage award based upon Blue Book estimates, as testified by expert witnesses, which reflect actual costs."  280 Va. at 427, 699 S.E.2d at 517 (emphasis added).  Although NeSmith was the expert the Supreme Court referred to as having testified that Blue Book estimates "reflect actual costs," the Supreme Court did not directly or indirectly compel the circuit court to use only NeSmith's testimony to calculate all damages.  The remainder of the mandate directed merely that "the circuit court shall review the evidence already presented in the

- 9 -

case and calculate damages to which AMEC is entitled" for the various listed claims.  Id. Therefore, the Supreme Court's mandate did not require the circuit court to consider only NeSmith's testimony.

VDOT also claims that the circuit court was required on remand to apply judicial estoppel to prevent AMEC from relying on Breese's rather than NeSmith's testimony regarding damages.  "'Judicial estoppel forbids parties from assuming successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory.'"  Lofton Ridge, LLC v. Norfolk S. Ry. Co., 268 Va. 377, 380-81, 601 S.E.2d 648, 650 (2004).  "The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process."  Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996) (quoting John S. Clark Co. v. Faggert & Frieden, P.C., 65 F.3d 26, 28-29 (4th Cir. 1995)), cited with approval in Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 326-27, 609 S.E.2d 49, 54-55 (2005).  Whether to apply the doctrine of judicial estoppel lies within the discretion of the trial court and will not be set aside absent an abuse of that discretion.  Bentley Funding Group, 269 Va. at 323-24, 609 S.E.2d at 53.

Two elements must be present before judicial estoppel may be applied:  First, "'the party sought to be estopped must be seeking to adopt a [factual] position that is inconsistent with a [factual] stance taken in a prior litigation.'"  Id. at 326, 609 S.E.2d at 54 (quoting Lowery, 92 F.3d at 224 (citation omitted)).  Second, the prior inconsistent position must have been accepted by the court, "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court

determinations, and thus poses little threat to judicial integrity."[3]  Id. at 327, 609 S.E.2d at 55

(quoting New Hampshire v. Maine, 532 U.S. 742, 751, 121 S. Ct. 1808, 1815, 149 L. Ed. 2d 968,

978 (2001)).  Stated differently, when applied in the context of a single case, this element

"'generally prevents a party from prevailing in one phase of [that] case on an argument and then

relying on a contradictory argument to prevail in another phase.'"  New Hampshire, 532 U.S. at

750, 121 S. Ct. at 1814, 149 L. Ed. 2d at 977 (quoting Pegram v. Herdrich, 530 U.S. 211, 227

n.8, 120 S. Ct. 2143, 2153 n.8, 147 L. Ed. 2d 164, 180 n.8 (2000)).

Here, on remand, the circuit court found first that AMEC's position regarding the correct

calculation of damages on remand was "not inconsistent with its original trial position."  Slip op.

at 4, 2011 Va. Cir. LEXIS 83, at *6.  It noted that at trial, "AMEC clearly relied on the testimony

of NeSmith and Bryon Breese when addressing actual costs."  Id.  The circuit court explained

further that while *it* "may have accepted NeSmith's testimony, AMEC did not offer his

testimony as the exclusive evidence of damages."  Id.  As to the second element, the circuit court

found AMEC's continued use of the testimony and exhibits of both men did not demonstrate any

intentional effort to mislead the court and that the Commonwealth did not offer any other

evidence of an intent to mislead.  Id. at 4, 2011 Va. Cir. LEXIS 83, at *7.

Applying an abuse of discretion standard as we must, we conclude the evidence supports

these findings.[4]  Viewing the evidence in the light most favorable to the circuit court's ruling,

---

[3] A third element, that the parties must be the same, is met here.  See Bentley Funding Group, 269 Va. at 326, 609 S.E.2d at 54.  The Supreme Court has noted a possible fourth element:  "'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"  Id. at 327 n.7, 609 S.E.2d at 54 n.7 (quoting New Hampshire v. Maine, 532 U.S. 742, 751, 121 S. Ct. 1808, 1815, 149 L. Ed. 2d 968, 978 (2001)).  However, as in Bentley Funding Group, "[a]n analysis of this element is not necessary to resolution of this case," id., in light of our conclusion, *infra* in the text, that the evidence supports the circuit court's discretionary conclusion that other elements necessary to the application of judicial estoppel were not met.

[4] We address the court's erroneous reference to both men as experts *infra* in Part II.C.

- 11 -

NeSmith's testimony was not independent of Breese's; NeSmith testified he used Breese's calculations as a base and checked them thoroughly for accuracy before determining the three areas in which his calculations regarding damages differed from Breese's. Also, the same circuit court and judge were involved at both stages, placing the circuit court in the best position to evaluate whether AMEC's actions were misleading to the court. Moreover, we hold the policy behind the doctrine of judicial estoppel is not implicated here. AMEC did not receive a victory when the circuit court accepted NeSmith's calculation of damages—the lower of the two total damages calculations AMEC presented at trial—because the appellate courts reversed numerous aspects of that calculation and remanded to the circuit court to address the issue again based on the evidence in the record. Thus, AMEC's actions did not constitute preserving one victory while arguing an inconsistent theory to obtain a second, conflicting victory.

## B. LAW OF THE CASE AND DAMAGES

"The law of the case doctrine provides that 'where there have been two appeals in the same case, between the same parties, and the facts are the same, nothing decided in the first appeal can be re-examined on a second appeal.'" Cnty. of Henrico Police v. Medlin, 37 Va. App. 756, 763, 561 S.E.2d 60, 63 (2002) (quoting Uninsured Employer's Fund v. Thrush, 255 Va. 14, 18, 496 S.E.2d 57, 58-59 (1998)). "The doctrine applies only in situations where a final determination or ruling has been made without objection." Torian v. Torian, 38 Va. App. 167, 175, 562 S.E.2d 355, 359 (2002) (citing Med. Ctr. Hosps. v. Sharpless, 229 Va. 496, 498, 331 S.E.2d 405, 406 (1985)).[5]

---

[5] VDOT avers that the question of the proper standard for appellate review of whether the law-of-the-case doctrine applies in a particular situation has not been decided by Virginia's appellate courts. It points out that most federal jurisdictions, including the Court of Appeals for the Fourth Circuit, apply a *de novo* standard of review, see, e.g., Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 480 (4th Cir. 2007), but notes that some jurisdictions apply an abuse of discretion standard, see, e.g., Giampapa v. Am. Family Mut. Ins.

Here, AMEC provided extensive evidence of damages through the testimony and exhibits of both NeSmith and Breese. As discussed *supra* in Part II.A., NeSmith's testimony was not independent of Breese's. Although the circuit court appears in the first proceeding to have relied on NeSmith's testimony in the areas in which NeSmith's and Breese's testimony differed, nothing in the record indicates it found Breese's testimony inaccurate or incredible. On appeal, the parties challenged multiple aspects of the circuit court's damages award. This Court and the Supreme Court reversed various aspects of the circuit court's damages award and remanded to the circuit court to "review the evidence already presented in the case and calculate damages to which AMEC is entitled" on various listed claims. 280 Va. at 427, 699 S.E.2d at 517. Nothing in the circuit court's or the appellate courts' rulings bound the circuit court to rely exclusively on NeSmith's testimony and evidence on remand. Thus, the circuit court's failure to apply law-of-the-case principles on remand was not error.

## C. TESTIMONY OF BRYON BREESE

VDOT contends the circuit court erred in accepting and relying on opinion testimony from Breese over VDOT's objections. In the evidentiary hearing, AMEC objected to the admission of portions of Breese's testimony on the ground that the testimony involved opinion and AMEC had not identified Breese as an expert in advance of trial. The circuit court held that Breese, the author of AMEC's administrative claim, exhibit 487, a document containing facts, was qualified to testify about those facts and that it "[did not] see this [as] an expert testimony issue."

In the original appeal to this Court, VDOT did not assign error to the circuit court's admission of Breese's testimony. Based on VDOT's failure to challenge the admission of

_____

Co., 64 P.3d 230, 243 (Colo. 2003). We need not resolve this issue because we hold that, regardless of the standard applied, the circuit court did not err.

- 13 -

Breese's testimony as improper opinion evidence in the first appeal, that admission has become the law of the case, and the circuit court was free to rely on Breese's testimony as establishing the necessary factual basis for some or all of AMEC's damages claim. Although the circuit court erroneously referred to Breese as an expert in its opinion on remand, slip op. at 4, 7, 2011 Va. Cir. LEXIS 83, at *6-*8, *13, nothing in the record indicates the circuit court relied on Breese's testimony as anything other than factual evidence. Thus, VDOT has failed to prove the circuit court committed reversible error.

## D. ACTUAL COSTS FOR PROVING AMEC'S DAMAGES

VDOT contends the circuit court erred in accepting *estimates* of costs rather than evidence of *actual* costs as proof of some of AMEC's damages on remand. It points to VDOT specification § 105.16, previously described by this Court as "the general dispute provision, . . . which twice states, 'Only *actual costs* for materials, labor, and equipment will be considered,'" 54 Va. App. at 277, 699 S.E.2d at 651 (quoting specification § 105.16). It notes the specification's further requirement that "'[t]he Contractor shall afford the Engineer every facility for keeping an *actual cost record* of the work. The Contractor and the Engineer shall compare records and bring them into agreement at the end of each day.'" Specification § 105.16 (emphasis added).

AMEC acknowledges the Supreme Court's decision recognizing that "the measure of damages in this case is actual cost." 280 Va. at 424, 699 S.E.2d at 515. AMEC emphasizes, however, that the Supreme Court accepted evidence that "Blue Book estimates" for the use of owned equipment "reflect actual costs," id. at 424-25, 699 S.E.2d at 515-17, and avers that estimates are sufficient to prove other aspects of its damages claim, as well.

The Supreme Court's instructions were clear that "the measure of damages" is "actual costs incurred by AMEC." 280 Va. at 427, 699 S.E.2d at 517. To the extent the contract

- 14 -

required interpretation beyond this issue, we review the circuit court's interpretation *de novo*. See, e.g., id. at 418, 699 S.E.2d at 511.

"Actual costs," as defined by this Court in the first appeal, is a term of art; it "includes direct costs (like the price of materials and wages of employees) and indirect costs (like home office overhead)" and excludes things like "profit margin mark-ups." 54 Va. App. at 277, 677 S.E.2d at 652. In defining "actual costs" in the first appeal to this Court, we relied upon the holding in Fairfax County Redevelopment & Housing Authority v. Worcester Brothers Co., 257 Va. 382, 514 S.E.2d 147 (1999). See 54 Va. App. at 277, 677 S.E.2d at 652.

We conclude the circuit court's interpretation and application of Fairfax County was erroneous. See slip op. at 5-6, 2011 Va. Cir. LEXIS 83, at *10. In Fairfax County, the Supreme Court reviewed the calculation of a unique category of costs, home office overhead, the recovery of which is not at issue in this appeal.[6] The Supreme Court provided no indication in its opinion in Fairfax County that the parties' contract *required* proof of actual costs expended as the method for measuring damages; it merely noted that the contractor in fact presented evidence of its actual costs to maintain its field office for 98 days beyond the original contract term of 150 days. Fairfax Cnty., 257 Va. at 385-86 & n.1, 514 S.E.2d at 149 & n.1. The Court noted further that "[the contractor's] accounting system did not allocate its home office expenses to particular contracts." Id. at 386, 514 S.E.2d at 149. However, the contractor's president calculated unabsorbed home office expenses attributable to the delay based on "the total general and administrative expenses of the company during the relevant contract period and the application of the Eichleay formula to those expenses." Id. at 385-86 & n.2, 514 S.E.2d at 149 & n.2.

---

[6] In the first appeal, the Supreme Court affirmed our determination that AMEC failed to meet its burden of proof on the home office overhead issue and, thus, that it was not entitled to recover for unabsorbed home office overhead expenses. 280 Va. at 421-23, 699 S.E.2d at 514.

The Court described the <u>Eichleay</u> formula as calculating a pro rata share of home office expenses attributable to a particular contract, based on the same ratio that the total amount billed on that particular contract has to the contractor's total billings during the contract period. <u>Id.</u> at 389 & n.5, 514 S.E.2d at 151-52 & n.5. Under that formula, once the amount of home office expenses attributable to the particular contract is determined, that figure is divided by the total number of days of the contractor's performance under the contract to determine a "daily contract home office expense rate." <u>Id.</u> at 389 n.5, 514 S.E.2d at 152 n.5.

The Court noted the <u>Eichleay</u> method "has been criticized as an inadequate substitute for direct evidence of the actual amount of damages and 'no less speculative' than other unsupported opinion evidence simply 'because it was cast in a mathematical milieu.'" <u>Id.</u> at 390, 514 S.E.2d at 152 (citation omitted). The Court held the question, under standard damages law, was "whether the resulting quantum [of damages] was 'an intelligent and probable estimate' of the actual damages." <u>Id.</u> (quoting <u>Pebble Bldg. Co. v. G. J. Hopkins, Inc.</u>, 223 Va. 188, 191, 288 S.E.2d 437, 438 (1982)). It concluded on the facts of that case, which included proof that the contractor had, in fact, "suffered actual damages as a result of an unreasonable owner-caused delay," that the <u>Eichleay</u> formula was an acceptable method of proving home office expenses attributable to the contract and that a more precise measure of damages for unabsorbed home office overhead was not required. <u>Id.</u> at 385, 390, 514 S.E.2d at 149, 152.

Thus, <u>Fairfax County</u> involved "prorating" a unique ninety-eight-day expense, the total amount of which had been proved by *actual costs* for the ninety-eight days at issue. It did not involve, as at least one component of the damages award did here,[7] proving the actual costs incurred for a *different* period and using that period to determine an average daily rate to be applied to the ninety-eight days at issue. The Supreme Court's opinion also contains no

---

[7] *See infra* Part II.E.1 (delay damages related to boulders).

indication it involved a contract specification like the one at issue here, which provides in

relevant part as follows:

> [Specification §] 105.16—Submission and Disposition of Claims.
>
>     \*      \*      \*      \*      \*      \*      \*
>
> At the time of occurrence or prior to beginning the work, the
> Contractor shall furnish the Engineer an itemized list of materials,
> equipment, and labor for which additional compensation will be
> claimed. Only actual costs for materials, labor, and equipment will
> be considered. The Contractor shall afford the Engineer every
> facility for keeping an actual cost record of the work. The
> Contractor and Engineer shall compare records and bring them into
> agreement at the end of each day. Failure on the part of the
> Contractor to afford the Engineer proper facilities for keeping a
> record of actual costs will constitute a waiver of a claim for such
> extra compensation except to the extent that it is substantiated by
> the Department's records. . . .

Requiring the submission of actual cost data "ensur[es] that the final amount of the . . .

adjustment will not be a windfall for either the government or the contractor." Steven W.

Feldman, <u>Government Contract Guidebook</u> § 17:9 (4th ed. 2011-2012). Under federal

government contracts law,

> Where it is impractical for a contractor to prove its actual costs
> because it failed to keep accurate records, when such records could
> have been kept, and where the contractor does not provide a
> legitimate reason for its failure to keep the records, [other methods
> of calculating the amount for adjustment are] not available to the
> contractor.

<u>Id.</u>

      We hold that, although, as the circuit court observed, general contract principles provide

damages may be proved with reasonable certainty, including averages and estimates, "unless the

contract clearly requires another standard," slip op. at 5, 2011 Va. Cir. LEXIS 83, at \*9, the

contract at issue here expressly requires "an actual cost record of the work," which includes "an

itemized list of materials, equipment, and labor" and "*actual cost*" for those items. Specification

§ 105.16 (emphasis added). The Supreme Court held, based on expert testimony in this case, that estimates of experts based on the Blue Book may be used to establish actual costs for the use of owned equipment, see 280 Va. at 425, 699 S.E.2d at 516, but we are aware of no expert testimony in the record which would permit AMEC to prove any other category of actual costs with mere estimates of those figures under the contract specification at issue here.[8] The circuit court concluded the delay figures were more than estimates; they were averages "based on composite values of costs incurred" and, thus, provided a reasonable approximation of AMEC's damages. Slip op. at 7, 2011 Va. Cir. LEXIS 83, at *13. We reach a contrary conclusion with regard to some of the damages calculations on the facts of this case. We hold that allowing AMEC to prove some of its damages using a daily job site overhead rate calculated by averaging actual costs over a period of two years deprived VDOT of its contractual right to pay damages based on actual costs. Compare Fairfax Cnty., 257 Va. at 385-86 & n.1, 514 S.E.2d at 149 & n.1 (decided under a contract of shorter duration, 150 days, coupled with a delay of 98 days, and which did not include evidence that an actual cost provision was involved). Cf. In re Daystrom Instr. Div. of Daystrom, Inc., 58-2 B.C.A. (CCH) ¶ 2050 (Armed Servs. Bd. of Cont. Apps. Dec. 23, 1958), available at 1958 ASBCA LEXIS 1166, at *35-*39 (where contract required calculation of general and administrative expenses in six-month increments, holding the averaging of monthly costs over the forty-five-month contract period was "not considered

---

[8] NeSmith was asked if he had "any opinions as to that methodology of taking a duration of sight [sic] overhead, reducing it to a daily rate, and then applying it to the number of days of delay." He responded, "I think it's appropriate and it's a process I've utilized on many occasions." However, when NeSmith was asked about the application of the "actual cost" specification to his calculation of damages, he testified "[he] inquired and was . . . instructed by counsel to use the force account [specification (§ 109.05) instead], and that's what [he] did." In the first appeal, the Supreme Court held the force account specification did not apply and that actual costs were to be used. 280 Va. at 420-21, 699 S.E.2d at 513-14. Thus, no expert testimony established that using an average daily rate calculated from data outside the delay period was an accepted method of determining actual costs.

equitable or in accordance with generally accepted accounting principles and practices," "would create a distortion[,] and would not reflect 'actual costs'"); SER-Jobs for Progress, Inc., 84-1 B.C.A. (CCH) ¶ 17,159 (Dep't of Lab. Bd. of Cont. Apps. Feb. 4, 1984), available at 1984 DOL BCA LEXIS 26, at *14-*15 ("[T]he fact that [the contract limited] appellant . . . in its expenditures [for contract modifications] to a maximum of one-twelfth of the total estimated cost for the last month of the original contract term does not justify the use of *average* monthly costs in pricing the *actual cost* of the one-month extension." (emphases added) (decided under the federal Contract Disputes Act of 1978)). The record revealed that these job site overhead figures contained large variations in monthly totals. Management staff figures, for instance, varied from a monthly low of about $50,000 to a high of about $80,000; other monthly fixed costs varied approximately $90,000 to approximately $200,000. The monthly expense of outside rented equipment varied from about $4,000 to about $43,500. The highest monthly job site overhead total was almost 28% higher than the lowest monthly total. Further, the total of the highest monthly job site overhead costs from each category was over 50% higher than the total of the lowest monthly overhead costs from each category. Finally, the job site overhead average for the winter months of 2003 to 2004 was 20% higher than the lowest month during the two-year period, further illustrating how using a monthly average including such months could inflate the damages above actual costs.

Because of this wide variation in monthly figures, we hold that, where proof of actual costs is expressly required by the parties' contract and the record establishes the plaintiff maintained those figures on at least a monthly basis, the defendant is entitled to have those monthly amounts proved without averages calculated based on wholly different months, absent expert testimony or inferences therefrom, accepted by the fact finder, that averaging data from different months outside the damages period is an accurate method of calculating actual costs.

Here, AMEC had ample opportunity to keep records of actual cost figures, and the record indicates it did so.[9] To the extent AMEC failed to introduce evidence of all necessary monthly totals at trial, the express language of the contract and the Supreme Court's instructions on remand bar AMEC from recovering any categories of damages for which its evidence to prove actual costs is insufficient. See Orlosky Inc. v. United States, 68 Fed. Cl. 296, 319, 321 n.18 (2005) ("Plaintiff[] . . . could have submitted . . . actual cost information on its damages. . . . [A]ny failures of damage proof were not due to the inexactness of the situation, but, rather, plaintiff's own failure to produce reliable information. Such failure cannot be used as justification 'for lessening the burden of proof.'" (quoting S.W. Elec. & Mfg. Corp. v. United States, 655 F.2d 1078, 1088 (Ct. Cl. 1981))).

Thus, to the extent the circuit court relied upon a daily average figure to calculate job site overhead damages, we hold it erred. We remand to the circuit court, as discussed *infra* in Part II.E., to recalculate the affected components of its damages award based on actual costs, rather than an average daily rate, to the extent the record contains sufficient data to permit it to do so. We note that the Supreme Court has approved prorating, as opposed to averaging, see Fairfax Cnty., 257 Va. at 389-90, 514 S.E.2d at 151-52, and instruct the circuit court, where prorating is necessary, to use the smallest inclusive period for which data is available.[10]

---

[9] Although the record showed deficiencies in recordkeeping related to owned equipment, the Supreme Court held that Blue Book rates constituted proof of actual costs for that component of damages.

[10] By prorating, we mean calculating actual costs for a defined period of time and, using a method akin to the Eichleay formula, dividing the resulting figure to determine the pro rata portion of the overall total that may fairly be attributed to a lesser number of days *fully within that period*. In proscribing mere averaging, as distinguished from prorating, we mean to prohibit using a method which calculates actual costs for a defined period of time and divides that figure to obtain a daily rate which is then used to estimate costs for a wholly different period of time *outside the defined period*.

## E. CHALLENGES TO SPECIFIC COMPONENTS OF THE DAMAGES AWARD

### 1. Delay Damages for Bridge Boulders

At trial, AMEC claimed it sustained delay damages in the construction of bridge 640 due to two sources. First, it claimed delay due to "differing site conditions," in the form of boulders discovered at the worksite. Second, it claimed delay from problems related to the drilled shafts for the bridge. The circuit court awarded a general verdict for all claimed damages based on a combined forty-day delay from both causes.

In the first appeal, we concluded AMEC failed to provide VDOT with proper notice of the drilled shaft claims and held those claims were barred. 54 Va. App. at 252-58, 677 S.E.2d at 639-42. We noted VDOT, on appeal, did not challenge its liability for damages attributable to the unexpected presence of the boulders but contended the evidence, viewed in the light most favorable to AMEC, "proved no more than 8 days of delay attributable to boulders." Id. at 269, 677 S.E.2d at 647-48. We held we were unable to "resolve this dispute on appeal given the inseverable nature of the circuit court's general verdict" and "remand[ed] the boulders claim to the circuit court with instructions to examine the evidentiary record and to make specific factual findings." Id. at 269, 677 S.E.2d at 648. The Supreme Court noted our remand to the circuit court for the purpose of evaluating AMEC's claim for delay damages resulting from the boulders was not challenged on appeal, and it reminded the circuit court "to review the record and make findings on whether AMEC proved its entitlement to damages resulting from the boulders at bridge B640." 280 Va. at 427, 699 S.E.2d at 517. On remand, the circuit court found "that AMEC [was] entitled to recover for the entire forty-day period in which the primary cause of the delay was the boulders." Slip op. at 23, 2011 Va. Cir. LEXIS 83, at *45.

We hold the evidence, viewed in the light most favorable to AMEC, is insufficient to support the award for the entire forty-day period. The record reflects that Jack Palmer was asked

- 21 -

whether he had "an understanding as to what the[] unforeseen site conditions were" that caused AMEC to be "'40 working days behind schedule.'" In the portion of the transcript relied upon by the circuit court, Palmer replied, "Yeah. They're speaking about the boulders there, speaking about the drilled shafts, but primarily about the boulders I believe."

As we noted in the first appeal, "'[w]here there is evidence of damages from several causes, for a portion of which a defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible.'" 54 Va. App. at 269-70, 677 S.E.2d at 648 (quoting TechDyn Sys. Corp. v. Whittaker Corp., 245 Va. 291, 296, 427 S.E.2d 334, 337 (1993)). "[R]easonable certainty" does not require proof of "the exact sum . . . lost" "with mathematical precision"; it requires "evidence of sufficient facts or circumstances to permit at least an intelligent and probable estimate thereof." Gwaltney v. Reed, 196 Va. 505, 507, 84 S.E.2d 501, 502 (1954).

The evidence relied upon by the circuit court to award AMEC damages for the entire forty-day delay was the testimony of Palmer that the delay was "*primarily* about the boulders I believe." (Emphasis added). We hold this evidence was insufficient "to permit at least an intelligent and probable estimate" of the damages causally related to the boulder problem. The only other evidence upon which AMEC relies to support this ruling is the testimony of AMEC Project Manager Loch Louman that the presence of the boulders made the work "very difficult." Thus, the evidence was sufficient to prove only an eight-day delay, as VDOT's inspector expressly testified and his daily reports reflected. Although the evidence supported a general finding that AMEC's damages were greater, AMEC failed to meet its burden of proof by offering specific evidence to establish by how much.

Thus, we remand to the circuit court to calculate damages, in the form of actual costs as set out in Part II.D., for these eight days of delay— March 14, 15, and 26, 2001, and April 5, 6,

9, 11, and 30, 2001.[11] We note the method used by the circuit court to calculate an average daily rate multiplier for the boulder delay claim does not comply with our instructions in Part II.D. The circuit court calculated the delay damages caused by the boulders using Breese's "Total Delay Costs" figure to determine its own "average daily rate" of $22,262 "for the entire 586-day period" of delay. Slip op. at 23, 2011 Va. Cir. LEXIS 83, at *46. A careful examination of Breese's exhibit indicates that he obtained these "Total Delay Costs" by adding all monthly job site expenses in six categories (management staff, office support staff, monthly fixed costs, AMEC owned support equipment, AMEC owned production equipment, and outside rented equipment) for the period of December 2002 to November 2004. Breese divided each total by the number of days within that period to obtain an "AVG. DIRECT COST PER DAY" for each category. He then transferred the daily averages to a summary sheet, added home office overhead, and calculated an eight percent markup for each category. He provided various credits, added the totals for all categories, and calculated a total delay cost for 586 days of delay, from which the circuit court derived its average daily rate of $22,262.

In addition to improperly including the disallowed component of home office overhead, this daily average delay rate calculated from costs incurred from December 2002 to November 2004, including two winter periods, neither proves actual costs nor provides a reasonable estimate of actual costs for various days in March and April of 2001, a period over eighteen months earlier when acceleration efforts may not yet have been underway, and comprising over 60% non-winter dates. We note the appendix is almost five thousand pages and the record substantially larger, and we have no duty to "'search the record . . . in order to interpret the

_____

[11] VDOT contends on brief that AMEC has failed to identify which eight days of the forty were clearly attributable to the presence of the boulders. However, which eight days were impacted is clearly indicated in the daily inspector's reports of VDOT employee Frederick Bingham.

- 23 -

[AMEC's] contention'" that it contains actual cost figures for this time period.  See Mason v. Commonwealth, 49 Va. App. 39, 46 n.2, 636 S.E.2d 480, 483 n.2 (2006) (quoting Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992)).  On remand, in order to recover, AMEC must direct the circuit court to evidence in the record permitting at least a reasonable estimate of its actual job site overhead costs, including any appropriate credits, for the eight 2001 dates at issue.

### 2.  Delay Damages for the First Winter Period

The original contract term called for completion of the project in November 2003.  54 Va. App. at 247, 261, 677 S.E.2d at 636, 643.  By March 2003, however, it had become apparent to AMEC that, due to various delays for which VDOT had already granted it extensions, an additional extension would be required which would include the winter of 2003 to 2004, id. at 262, 677 S.E.2d at 644, defined by specification § 108.09 of the contract as "the period between November 30 of one year and April 1 of the following year," 54 Va. App. at 261, 667 S.E.2d at 644.  Thus, in March 2003, AMEC provided VDOT with written notice of its intent to claim damages for the extension from November 1, 2003, to April 1, 2004.  Id.  Ultimately, work continued through the winter of 2004 to 2005, as well, and was completed in June 2005.

When AMEC later filed suit, it alleged that it not only continued to work during the winter periods, but that it also used additional equipment and materials and that it "extended shifts and overtime in an effort to escalate performance to mitigate [VDOT's] delays."  It alleged further that it "incurred further inefficiency costs as a result of the required increase in manpower."

The circuit court included in its general verdict AMEC's request for an award of damages sustained during both the winter of 2003-2004 (the first winter period) and the winter of

- 24 -

2004-2005 (the second winter period). VDOT challenged these awards on appeal. We held as follows:

> [W]e cannot determine how much, if any, of the damage award is attributable to either or both of the additional winter periods. . . . [E]ven when a government contract authorizes recovery of damages for winter weather, the "contractor must demonstrate -- through contemporaneous records if possible -- the extent of the adverse weather and its impact on critical activities." We direct the circuit court on remand to review the evidentiary record and to make specific findings on whether AMEC proved any entitlement to damages for conditions during either or both of the two additional winter periods. If the court finds in AMEC's favor, the court should identify the contractual basis for the award and make factual findings as to the specific damages awarded.

54 Va. App. at 268-69, 677 S.E.2d at 647 (quoting Steven W. Feldman, Government Contract Guidebook § 29:7, at 821 (4th ed. 2008-09) (covering federal government contracts)).

On review, the Supreme Court noted that our remand to the circuit court for the purpose of evaluating AMEC's claim for damages for either or both of the winter periods was not challenged before it, and it reminded the circuit court, "if it finds in favor of AMEC [on remand], [to] identify the contractual basis of such award and make factual findings as to any damages awarded." 280 Va. at 427, 699 S.E.2d at 517.

The circuit court, on remand, disallowed recovery for the second winter period but held AMEC was "entitled to recover for the full 121 days" of the first winter period. In doing so, it noted contract specifications §§ 104.03 and 108.09 "provide[] that if there is a differing site condition, and such differing site condition extends the working period into the winter period, and working conditions during the winter period are not suitable, a contractor may recover." Slip op. at 17-20, 2011 Va. Cir. LEXIS 83, at *34-*39. The court found a contract extension required due to high water pushed the contract period into the 2003-2004 winter period and made the following additional findings:

Although no single standard dictates whether "working conditions . . . are unsuitable [under § 108.09]," Breese testified that "the ambient air temperature inside the form has to be a certain temperature before you can place concrete" and that the rebar and forms must also be a certain temperature. He explained that "[c]oncrete costs more to pour in the winter" because AMEC had to "maintain the concrete temperature, the surface temperature of the concrete to 50 degrees for a period of seven days." These items and tasks—concrete blankets, buying propane, heating supplies—are not a concern in the spring, summer, and fall.

AMEC is seeking recovery for the full 121 days of the first winter period. The raw weather data for Clarksville, Virginia [as shown in exhibit 1149B], provides ample support for this recovery, as the data shows that the temperature failed to reach 50 degrees Fahrenheit for roughly one third of the first winter period. Also, nearly half of the days during the first winter period experienced temperatures below freezing. During this time, AMEC's receipts show a significant number of purchases for materials to compensate for the cold weather. For example, AMEC itemizes winter construction tools such as concrete curing blankets, propane radiant heaters, thermometers, and various heater supplies. Because both a contractual basis and a factual basis exist for AMEC's claim for compensation during the first winter period, AMEC is entitled to recover for the full 121 days.

\* \* \* \* \* \* \*

[Using AMEC's exhibit 487,] [t]he Court calculates actual jobsite overhead costs in the amount of $3,107,305.26. After adding the actual jobsite overhead costs, lost productivity, markup, and additional curing costs, the Court will award AMEC $3,236,784 in damages for the first winter period, as detailed in the chart below[, containing a month-by-month breakdown of the totals listed *supra*].

Slip op. at 18-19, 2011 Va. Cir. LEXIS 83, at \*34-\*37 (citations omitted) (footnote omitted).

The circuit court then reproduced the figures from Breese's exhibit 487 which showed actual monthly totals for job site overhead for the months of December 2003 through March 2004. Id.

VDOT argues AMEC failed to prove entitlement to compensation for the full winter period because it did not "show[] the actual impact of weather on its work activities" or, alternatively, that it "prove[d] only six days of actual impact," based on the number of days when

- 26 -

weather required a complete cessation of work. It contends further that AMEC has not proved its actual costs for either the full 121 days or the six days of actual work stoppage.

Per the language of specification § 108.09, when a delay "extends the contract time limit into the period between November 30 of one year and April 1 of the following year," "consideration may be given to granting an extension of time" if "working conditions during such period are unsuitable for the completion of the work." If the conditions cause an increase in the time required for the performance of any work under the contract, the contractor may be entitled to "an adjustment, excluding anticipated profits." Specification § 104.03; see also Federal Acquisition Regulation (FAR) 52.242-14 (codified at 48 C.F.R. § 52.242-14) (allowing for a similar recovery for federal contractors under language providing that "an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit)"). We expressly held in the first appeal that a government contractor seeking damages for winter weather "must demonstrate – through contemporaneous records if possible – the extent of the adverse weather and its impact on critical activities." 54 Va. App. at 268-69, 677 S.E.2d at 647 (citing Feldman, supra, § 29:7, at 821 (4th ed. 2008-09)). The language of the contract itself supports this result: Although the contract does not contain a specific standard for determining when damages may be available for winter work, we hold the § 108.09 standard for issuing an extension applies and that an entitlement to recover damages for winter weather requires proof that "working conditions during such period are unsuitable for the completion of the work."

To recover damages during a winter period, a contractor need not prove it was wholly unable to work. See Feldman, supra, § 29:7, at 850-51 (4th ed. 2011-2012). It need prove only that weather conditions caused it to incur additional costs in performing under the contract. Id. Costs recoverable during a winter period, in addition to those available as a result of *any* delay that extends the contract period—i.e., unabsorbed home office overhead and work site overhead,

base costs for labor and materials, and insurance and bond premiums—include idle time for equipment during periods of work stoppage and any increase in labor, materials or other costs required to perform in the adverse weather conditions, including reductions in productivity. Id. at 849-51.

Applying these principles in the instant case, we hold the evidence was sufficient to support the circuit court's ruling that AMEC was entitled to recover damages for the entire 121 days of the first winter period. The evidence, viewed in the light most favorable to AMEC, established that bridge 616 was the largest structure on the project and demanded the majority of the project resources. It was the portion of the project requiring the longest path to completion and, thus, working on it was "a critical path activity" which impacted the project completion date. Elevated water levels in the first part of 2003 required the suspension of the majority of critical path activities on bridge 616 during that time. As a result, the project was not completed by November 1, 2003, as scheduled, and AMEC was required to work through the winter period. Critical path work necessarily included bridge 616, and the daily reports completed by VDOT Inspector Frederick Bingham confirm that AMEC's work throughout the first winter period involved drilling holes, setting casings and foundation cap forms, and pouring concrete to create shafts and caps to support the various piers comprising bridge 616. The records show nearly half the days during the first winter period experienced temperatures at or below freezing. Further, the records reveal not a single span of time during that period in which the low temperature was 50 degrees or higher for seven successive days as required to allow the concrete to cure naturally without additional supplies or labor. The cold weather caused AMEC to incur additional costs in the form of supplies to keep the concrete warm and labor to put the supplies in place. The evidence also established AMEC rented and purchased additional forming supplies so workers could construct more shafts and caps simultaneously.

Finally, Breese testified the winter costs contained in exhibit 487 were recorded, "[s]imilar to everything else, directly from the detailed transaction report, review of the invoices that we received on the job." Breese also calculated a loss of productivity factor of 10% "based heavily on [his] experiences on the job" and in consultation with AMEC employees Grant Ralston and Jack Palmer. NeSmith compared Breese's loss of productivity percentage to ones in treatises, found them to be reasonable, and used the same percentage himself. Wenick testified "if you're out there working in the winter, it's most likely that there's going to be a lessened productivity." After reviewing the daily logs, Wenick confirmed there were "substantial delays particularly in the 2003-2004 winter period" which negatively impacted AMEC's ability "to do critical path work."

Although AMEC may have failed to introduce records of its own articulating precisely how weather conditions impacted critical activities on a daily basis, the record nevertheless contains evidence sufficient to support the circuit court's finding that the documented temperatures throughout the period at issue impaired AMEC's ability to prepare the massive concrete substructure for bridge 616. This award does not result in a windfall to AMEC, for the winter delay damages are neither liquidated nor based on an average daily job site overhead rate. The record contains actual cost data for the four months of overhead delay damages and indicates the circuit court relied on this data. Slip op. at 17-18, 2011 Va. Cir. LEXIS 83, at *36-*37. The circuit court calculated its award of damages from Breese's exhibit 487, which sets out monthly figures from December 2002 to November 2004 for job site overhead, with appropriate deductions for profits and home office overhead as ordered by the appellate decisions.

However, we hold that by using Breese's actual cost figures for these four months, the circuit court failed to factor in Breese's equipment credits, which he applied only after

calculating the average daily rate we have rejected. On remand, the court should apply any appropriate credits for the four months at issue if they are discernible from the record.[12]

We also direct the circuit court to reexamine the figures for lost productivity and markup. We are unable to discern how the lost productivity figure was calculated. We also agree with VDOT's argument that the circuit court improperly included a "markup" figure of 47% on the loss of production figure, a markup the circuit court applied to other lost productivity calculations, as well. The circuit court analyzed the question of the proper markup percentage as follows in order to reflect actual costs as required by the Supreme Court's ruling:

> Both parties utilize the testimony of Peter Wade, VDOT's expert, for the proper markup percentage. AMEC adopted the testimony of Wade to reach a 47% markup. VDOT argues AMEC should receive only a 39% markup, because Wade testified that his estimate included an 8% figure for "margin in the bid." The Supreme Court held the "[appropriate] adjustment to the contract" does not include profits. AMEC Civil, 280 Va. at 421[, 699 S.E.2d at 513-14]. VDOT asks the Court to find that "margin in the bid" means only profit but offers little support for such an interpretation. AMEC argues "margin in the bid" includes more than just profit.
>
> Expert testimony does not resolve the issue. Wade's testimony provides for a range of 47% to 59%. A 59% markup would allow AMEC to recover disallowed profits. VDOT's request for a 39% markup would necessarily exclude recoverable costs. Thus, the Court will use a 47% markup to prevent the recovery of disallowed profits or the denial of recoverable costs.

Slip op. at 10, 2011 Va. Cir. LEXIS 83, at *20-*21 (citations omitted).

Viewing Wade's testimony in the light most favorable to AMEC, "margin in the bid" includes more than just profit, such that the 8% markup or margin included in Wade's 47% figure comprises both profit, which is not recoverable, and an unidentified component in an unknown percentage, which may be recoverable. Based on AMEC's duty to prove its damages

---

[12] The credits, like the costs, may be prorated but not averaged. If these amounts are not discernible from the record, AMEC would be entitled to recover actual costs for all categories of overhead expenses incurred except those against which the credits are due.

with reasonable certainty, we hold the circuit court erred in concluding AMEC is entitled to the 8% markup in addition to the 39% because it is undisputed that a portion of that 8% is disallowed profit and AMEC failed to meet its burden of proving what percentage is not profit. Thus, the proper markup amount to be applied to the "loss of productivity" claims on remand is 39%.[13]

### 3. Delay Damages for High Water

The circuit court found AMEC was entitled to damages for 237 days of delay between March and October of 2003 and 60 days between April and June of 2004. As argued by AMEC, the court used the chart in Breese's exhibit 487, titled "Clarksville Overhead Recap," the same chart Breese used to calculate an average daily overhead delay rate. The chart included compilations of actual monthly costs for categories comprising job site overhead—management staff, office support staff, monthly fixed costs, AMEC-owned support equipment, AMEC-owned production equipment, and outside rented equipment for each month from December 2002 to November 2004.

Using Breese's chart, the court totaled his calculations of job site overhead costs for March to October of 2003, a period of 245 days. Slip op. at 15-16, 2011 Va. Cir. LEXIS 83, at *30-*31. It then prorated that total to the claimed period of 237 days, resulting in a figure of $5,692,861. Using the same method, the court totaled job site overhead costs for April to June of 2004, a period of 91 days. It then prorated the total to the claimed period of 60 days, resulting in a figure of $1,575,213.21. Id.

VDOT challenges these calculations on appeal, contending the circuit court erred in both the number of days and the amount of damages it calculated.

---

[13] The circuit court properly included no markup on the additional curing costs.

The evidence, viewed in the light most favorable to AMEC, supports the circuit court's findings concerning the number of days of delay. Just as with the winter weather, *see supra* Part II.E.2., elevated lake levels adversely impacted AMEC's ability to work on bridge 616, severely limiting the workers' ability to access the lake to complete the foundation caps, columns, and other critical path work. Louis Wenick, an engineering consultant who testified for AMEC as an expert in construction scheduling and delay analysis, examined the project records. He noted VDOT had granted an extension of 185 days in 2003 due to elevated lake levels and opined, based on project records and impact of the delay on critical path work, VDOT should have granted 52 more during that period of time, for a total of 237 days. AMEC, through Wenick, also presented evidence of 60 additional days of delay due to high water between April 10 and July 10, 2004. This evidence supports the circuit court's award of damages for 297 days of delay due to high water.

VDOT also objects to the use and proration of Breese's monthly job site overhead data to calculate extended overhead damages and argues that NeSmith's figures, which were based on his calculation of an average daily job site delay rate, are no better. Thus, VDOT contends AMEC has failed to present any evidence proving the actual costs of the extended delay damages caused by high water. Without actual daily costs, VDOT contends AMEC may not recover extended overhead damages.

As discussed *supra* in Part II.D., we hold the circuit court did not err because prorating the actual costs incurred provided a reasonable estimate of AMEC's damages. However, as discussed *supra* in Part II.E.2., we hold that by using Breese's actual cost figures for these months, the circuit court failed to factor in Breese's equipment credits, which he applied only

after calculating the average daily rate we have rejected. On remand, the circuit court should apply any appropriate credits for the months at issue if they are discernible from the record.[14]

### 4. Acceleration Damages

AMEC sought acceleration damages for three time periods, the temporal boundaries of which were determined by the impact of high water on the project—January 1, 2002, to February 22, 2003 (before impact of high water); February 23, 2003, to August 21, 2004 (during impact); and August 22, 2004, to June 11, 2005 (after impact). Calculating those damages involved totaling costs associated with lost production and additional premium labor costs.[15] AMEC presented evidence of the total actual costs for each period.

The Supreme Court, based on contractual notice requirements, ruled AMEC is entitled to recover only those acceleration damages incurred after April 2004. 280 Va. at 412-13, 699 S.E.2d at 508-09. Thus, it is undisputed that AMEC is entitled to acceleration damages, subject to meeting its burden of proving amount, for a portion of the second period, from May 1, 2004, to August 21, 2004, and for the entirety of the third period, August 22, 2004, to June 11, 2005. The circuit court prorated the second period, dividing the number of days in the second period which fell within the allowable recovery period (113) by the total number of days in the entire second period (546), concluding those "113 days account for roughly 20.7% of the second period." The circuit court awarded AMEC 20.7% of the damages claimed for the second period

---

[14] *See supra* note 12.

[15] Calculating acceleration damages also required the circuit court to analyze the additional labor and material costs relating to use of the second foundation cap form. See slip op. at 11-13, 2011 Va. Cir. LEXIS 83, at *22-*27. VDOT discusses these calculations on brief and agrees with each of the calculations the circuit court made. Thus, we need not consider these calculations on appeal.

in Breese's exhibit 487.  The circuit court noted AMEC is entitled to recover for 100% of the time in the third period.[16]

VDOT contends that the circuit court erred in awarding AMEC 20.7% of the damages claimed for the second period in Breese's exhibit 487.  VDOT contends AMEC was required to prove actual labor costs for the dates at issue and that proration is not permitted.  VDOT contends the record does not contain cost data from which actual straight time and overtime labor costs for the specific 113 days at issue during the second period could be calculated.

As discussed *supra* in Part II.D., we hold the circuit court did not err because prorating the actual costs incurred provided a reasonable estimate of AMEC's damages.

### 5.  Damages Related To Bridge 616, Pier 18

Due to an error in the plans, AMEC was required to perform additional work on pier 18 of bridge 616.  AMEC requested damages of $11,303 based on Breese's exhibit 487, which it contended represented "actual costs for direct labor and burden."  VDOT calculated that AMEC was entitled to the slightly greater sum of $11,375 in damages for this error.  The circuit court was unable to determine how AMEC calculated the damages figure it requested, and the circuit court calculated its own damages in the higher amount of $11,327.38.  However, because AMEC requested only $11,303, the circuit court awarded only that amount.  VDOT contends that even though the amount of damages awarded was "in VDOT's favor, [it is] still error for disregarding NeSmith's work and should be reversed."  Because the circuit court awarded less than VDOT admitted it owed on this claim, we find it unnecessary to reach VDOT's underlying evidentiary challenge and do not disturb this portion of the damages award.

---

[16] The circuit court also awarded a 47% labor burden markup.  We hold, as discussed *supra*, in Part II.E.2., that this figure should be 39% of actual costs awarded.

F.

ASSIGNMENT OF CROSS-ERROR:  POST-JUDGMENT INTEREST

AMEC contends the circuit court erred in refusing its request for post-judgment interest. We hold AMEC waived its right to assert this claim under either of two theories.

In the original proceeding in the circuit court, AMEC expressly sought only pre-judgment interest.  It made no request for post-judgment interest.  We hold that AMEC, by failing to make this request in the circuit court as part of the first proceeding, waived its right to do so.  See generally Irwin v. Irwin, 47 Va. App. 287, 298, 623 S.E.2d 438, 443-44 (2005) (holding that the wife waived her right to receive more relief than she expressly requested).

Alternatively, we conclude AMEC's claim for post-judgment interest is barred because it was ruled upon and denied and AMEC failed to challenge that denial on appeal.  AMEC's amended complaint sought damages, "prejudgment interest," *and* "such other and further relief as this Court deems appropriate."  AMEC's proposed conclusions did not indicate an intent to limit its request to pre-judgment interest.  Finally, the circuit court, in its July 16, 2008 order, directed "that judgment should be entered against Defendant in the sum of $21,181,941.00 without interest or attorneys' fees."  The court did not limit its ruling to pre-judgment interest. By exceptions filed July 18, 2008, AMEC excepted to the circuit court's determination that it was "not entitled to interest or attorneys' fees as a part of the judgment against Defendant" and the court's statement "that it did not award interest on the judgment because it could find no authority giving it jurisdiction to do so."  Thus, AMEC took exception to the court's refusal to award any interest and did not limit its exception to pre-judgment interest.  In the first appeal to this Court, however, AMEC addressed only its claim for pre-judgment interest.  The Court of Appeals and Supreme Court also addressed only the issue of pre-judgment interest.  The Court of

Appeals expressly did not address the issue of post-judgment interest, 54 Va. App. at 281, 677 S.E.2d at 653, and AMEC did not assign error to this failure.

"'Under [the] law of the case doctrine, a legal decision made at one [stage] of the litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.'" Kondaurov v. Kerdasha, 271 Va. 646, 658, 629 S.E.2d 181, 188 (2006) (quoting Va. Vermiculite, Ltd. v. W.R. Grace & Co., 108 F. Supp. 2d 549, 609 (W.D. Va. 2000)).  Thus, the circuit court's entry of judgment "without interest or attorneys' fees" in the July 18, 2008 order constitutes the law of the case and is applicable in this second appeal to bar AMEC's claim for post-judgment interest.

## III.

For these reasons, we affirm in part, reverse in part, and remand to the circuit court for a recalculation of damages consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.